# Wheeling.

HENDERSON STURM *vs.* RICHARD PARISH, *et. al.*

January Term, 1865.

1. S. sells a lot of land to D., who sub-divides and sells to P. and S., and *Parish ;* S. conveys by deed to P. and S., the vendees of D, without retaining vendor's lien; subsequently S., at the instance of *Parish*, conveyed to him the lot sold him by D., upon his paying him the balance of the purchase money due on the whole land by D., and executed to *Parish* a paper promising to refund the said balance of purchase monsy, if it should appear that the portions sold to P. and S. were liable for the payment of said balance. HELD :

> That the paper so executed by S. to *Parish*, was a promise without a consideration.

2. A promise or contract where there is no valuable consideration, and where there is no benefit moving to the promisor, or damage or injury to the promisee, is void.

*Richard Parish* brought a bill on the chancery side of the circuit court of *Marion* county, at the December rules, 1852, stating that about the 15th day of March, 1851, he purchased of one *George Downs* a tavern stand and lot of ground in *Worthington, Marion* county, for the price of 1400 dollars; 900 dollars whereof he paid in cash, and executed bonds for the payment of the residue as follows: 200 dollars due April 1st, 1852, 200 dollars April 1st, 1853, and 100 dollars April 1st, 1854; that *Downs* gave him a title bond binding himself to make a deed with covenants of general warranty against the 1st day of April, 1852; that *Downs* assigned the bond due April 1st, 1852, to one *Henderson Sturm*, who brought suit thereon and recovered judgment at the fall term of the circuit court of *Marion* county, and that an execution was then in the hands of the sheriff for the collection of the money and costs; that *Downs* had assigned the other bonds to one *Thomas F. Conaway*, but did not know which of the assignments to *Sturm* and *Conaway* to

126 COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,      Sturm vs. Parish, et. al.      1865.

place first; that he learned that one *Jesse Sturm* held a vendor's lien on the tavern stand and lot for purchase money due from *Downs*, his vendor, and that he had in fact no title for the same, but it still remained in *Jesse Sturm* who was threatening to bring a suit to enforce the payment of his purchase money; that said *Downs* was wholly insolvent, and that the assignment to *H. Sturm* being in blank he could not speak as to any priority between him and *Conaway*. He therefore prayed that *Downs, H. Sturm, Conaway* and *Jesse Sturm* be made parties to the bill, and that the latter be required to answer how much purchase money was still due and owing to him by *Downs*, and that *H. Sturm* and *Conaway* be required to show respectively their assignments and the date thereof: and that an injunction be granted the complainant to stay all further proceedings until all questions could be heard by the court.

At March Rules, 1853, *Jesse Sturm* filed his answer stating that he sold to *Downs* the house and lot mentioned in the bill for the sum of seven hundred and fifty dollars; that by the terms of the sale he was to make a deed to *Downs* when the purchase money was all paid; that on the 1st day of February, 1853, there was due and remaining unpaid of the said purchase money one hundred and eighty-nine dollars and twenty-four cents, which was a lien on the house and lot, and that he was willing to make a deed to *Downs* or any person whom the court should designate upon the payment of said remaining purchase money.

At the April term, 1853, of the circuit court, *Henderson Sturm*, after moving to set aside the decree *nisi*, filed his answer, admitting, so far as he knew, the statement of the complainant as to the amount and number of the bonds executed by complainant to *Downs*, and stating that the bond for two hundred dollars due April 1st, 1852, was assigned him by *Downs* on the first Monday in April, 1851, and that the other two hundred dollar bond was then in the possession of *Downs* and unassigned and that *Downs* wished to sell the same to him; that the complainant, *Parish*, was duly notified of the assignment to him, and remarked when so

notified that it was all right; that he was ignorant at the time of said assignments to him of any purchase money being due from *Downs* to *Jesse Sturm*, and heard of no such objection from *Parish* when notified of the assignment, and called for proof of all the material facts from the parties putting his interests in jeopardy.

On another day of the same term of court, *Conaway* filed his answer alleging that he had no personal knowledge of the terms of sale between *Jesse Sturm* and *Downs*, nor whether there had ever been a deed to *Downs* or not; that he purchased, and took an assignment thereof, the bond for two hundred dollars due April 1st, 1853, and also the one for one hundred dollars due April 1st, 1854, on the 26th day of June, 1851, for a valuable consideration; that before doing so he saw complainant, *Parish*, who informed him that the bonds were right and just and he would pay them, and alleged that he was an innocent holder, and asked the protection of the court.

The cause was heard at the June term, 1854, upon a motion of defendant, *H. Sturm*, to dissolve the injunction, which motion was sustained and no damages were allowed. The cause was also referred to a master to ascertain and report, what amount of purchase money was due defendant, *Jesse Sturm;* what amount of purchase money the complainant, *Parish*, paid to defendant, *Downs*, and when it was paid, whether before or after notice of assignment of the bonds, and whether the bonds assigned to *Conaway* by *Downs* were a part of the consideration for the house and lot bought by *Parish* of *Downs*; and whether there were any other lands than those mentioned in the bill upon which the purchase money due *Jesse Sturm* was a lien, and whether *Downs* sold all the lands he purchased of *Sturm* to complainant, *Parish*, and if not, who holds the same. In June, 1855, it was ordered by the court, that the surveyor of the county go on the lands and make survey of the same and return a plat to the court, and leave was also given the complainant to file an amended bill, which he did at the September rules following, alleging therein that since the filing of his ori-

ginal bill he had ascertained that defendant, *Downs* had sold a portion of the land mentioned in the original bill to *B. R. Patton, T. F. Sharp* and *H. Nay,* and asked that they be made parties defendant to the original as also the amended bill. *Patton, Sharp* and *Nay* not answering, the bill was, as to them, taken for confessed. The cause again was heard at a special term of the court in November, 1856, when the report of the master, to which there were exceptions, had been filed, and the court was of opinion that the exceptions should be overruled and that there was due, according to the said report, to said *Jesse Sturm* by defendant, *Downs,* one hundred and twenty-nine dollars and twenty-four cents with interest from the 1st day of April, 1853, purchase money for the lot of land purchased by him from said *Jesse Sturm,* which was a lien on the same; it further appearing to the court that *B. R. Patton, T. F. Sharp* and *H. Nay* purchased parts of the lot of land so sold by *Sturm* to *Downs,* from said *Downs, after* the purchase of the complainant, *Parish,* was made : the cause was again referred to a master to ascertain and report the date of each sale and also a particular description of the parcels so sold and purchased by *Patton, Sharp* and *Nay;* leave was also given complainant to file an amended bill making one *Peter Tetrick* a party, who was a vendee of *Downs* to a part of the land mentioned in the bill.

*Tetrick* answered at the June term, 1857, alleging that part of the land, a lot containing less than one acre, was sold by *Downs* to *Sharp,* who sold it to *Nay* and he conveyed it in trust to *E. B. Hall,* trustee, who sold it under the provisions of the trust, and himself, *Isaac Nay,* and one *Jeremiah Hess* became the purchasers; that these purchasers on the 13th day of October, 1853, instituted suit in the circuit court of *Marion* county against *Jesse Sturm,* the original holder, and others to procure the legal title from said *Sturm;* that said sale under the trust was made with the knowledge and assent of *Sturm* and the other parties in interest, and a decree was had against *Sturm,* he failing to appear and answer, requiring him to make a deed conveying the legal title to *Tetrick, Nay*

and *Hess:* which he subsequently did on the 15th day of December, 1855, and that *Hess* afterwards, on the 7th day of July, 1856, conveyed by deed his interest to *Tetrick* and *Nay;* and that at the time of the purchase under the trust he knew of no incumbrances or liens.

The complainant *Parish,* at July rules, 1858, filed an amended bill stating that he learned that *Downs* had divided the land purchased of *Jesse Sturm* into three lots, and that the one sold complainant was prior to the sales made *Patton* and *Sharp,* that sale being made on the 13th day of March, 1851, and the sales to *Patton* and *Sharp* some eight or ten months afterwards: that *Sharp* sold the lot bought by him to one *C. H. Davis, Davis* to *H. Nay,* who conveyed in trust to *E. B. Hall,* and then set up the sale under the trust and the suit against *Sturm* and others, as responded by *Tetrick* in his answer; he also alleged that he knew nothing of the suit of *Tetrick* and others against *Sturm,* although commenced long after his original suit had been brought; that said *Sturm* also made a deed to one *N. H. Martin,* who was a vendee of *Patton,* who purchased one of the lots from *Downs,* acknowledging payment of purchase money; that in 1855 *Sturm* represented to complainant that his unpaid purchase money from *Downs* would have to be paid, that *Downs* was unable to pay it, and that the complainant was induced to pay the balance to *Sturm,* amounting to 212 dollars and 13 cents including interest, for which he took a receipt from *Sturm,* and also an instrument in writing purporting to be a refunding receipt given the complainant by *Jesse Sturm,* that in the event of other of the lots of land sold by *Downs,* being liable to *Sturm* for any portion of the purchase money, he would refund to the complainant that liability with interest; and that *Tetrick, Hess* and *Nay* refused to pay any part of the said two hundred and twelve dollars and thirteen cents, alleging that they had a deed from *Sturm,* as also did *Martin* the vendee of *Patton* who also had a deed from *Sturm,* and that *Conaway* had brought suit to collect the bonds of complainant executed to *Downs.* He therefore alleged that the *Patton* and *Sharp* lots were bound to *Sturm*

for the said balance of purchase money, unless *Sturm* had released them by his own act, and if so then he was bound to refund the sum of two hundred and twelve dollars and thirteen cents to the complainant according to his receipt. To this amended bill *Jesse Sturm* answered at the following September rules, that there remained due him on the sale to *Downs*, of the original purchase money of seven hundred and fifty dollars, one hundred and eighty-nine dollars and twenty-four cents, on the 1st day of February, 1853, and not one hundred and twenty-nine dollars and eighty-four cents as reported by the master, (alleging that the master misplaced the figures of the amount); that the reason he permitted the bill in the suit against himself by *Tetrick*, *Hess* and *Nay* to be taken for confessed, was because he understood and believed that the lots sold by *Downs* to *Patton* and *Sharp*, were so sold prior to the sale to the complainant, and that the lot sold to the latter was amply sufficient to satisfy the balance due him from *Downs;* that the evidence upon which the master predicated his conclusions as to the order and dates of the sales of the respective lots by *Downs*, was insufficient to prove that the complainant purchased his lot first; that *Patton*, as respondent was informed, agreed to re-sell to *Downs* lot No. 2 (as defined on the plat of the surveyor,) and took his bonds therefor, but that *Patton* in fact never parted with the possession of the lot and continued to collect the rents accruing thereon, nor did said bonds express on their face for what they were given, and that when the first one became due, *Downs* was utterly insolvent and the bonds were cancelled and given up; that on or about the 3rd day of February, 1855, the respondent executed a deed to *Patton's* vendee, *Martin*, for lot No. 2, at the request of *Downs*, *Patton* and *Martin* retaining no lien, and on the same day at the instance of complainant, *Parish*, and the *Nays*, he executed a deed to *J. B.* and *A. E. Nay* for lot No. 1, sold by the complainant to them, retaining no lien, and also on the same day executed a deed conveying the other and remaining part of the land sold to *Downs*, to the complainant, but refused to deliver the same until the balance of purchase

money due him from *Downs*, was paid with interest; that afterwards, on the 20th day of February, 1855, the complainant paid him the residue of the purchase money, one hundred and eighty-nine dollars and twenty-four cents with interest, in all two hundred and twelve dollars and thirteen cents; and that six months afterwards, when the complainant expressed dissatisfaction and suggested that some other part of the land should be made liable to the payment of the purchase money, he executed to him the refunding receipt to make him easy; that he did not importune complainant to pay the residue, and took upon himself the burden of straightening up the matter, but that complainant presented respondent with a writing from *Downs* directing him to convey the lot to complainant, which he agreed to do when the purchase money was paid and not otherwise, and that complainant then had his suit pending to settle the matter with the assignees of *Downs*, respondent ever maintaining that the land to complainant, *Parish*, was last sold and liable to the payment of his purchase money, and never heard it questioned until complainant suggested the matter, when he signed the writing called a refunding receipt; and that the grantees in all the deeds from respondent, were resident about the premises and knew all the facts in relation to the sales, whilst he lived at a distance, and to take advantage of what they knew to be a mistake would be a fraud upon the respondent.

*Tetrick* and *Isaac Nay* also answered the amended bill, alleging that the land bought by them was sold after that sold to complainant, *Parish*, that their title was decreed them by the court and could not be wrested from them; that the balance paid by complainant to *Sturm*, was paid voluntarily and could not be then recovered on the ground of mistake; that the paper marked "N" did not bind *Sturm* as it was subsequent and without consideration and of no validity; that a new case was presented by complainant's amended bill, being for refunding money voluntarily paid, and that they ought not to be involved or prejudiced thereby.

The cause was again referred to a master in June, 1860,

to review his report previously made, and to ascertain whether the defendant, *Jesse Sturm*, knew, before the date of the final decree in the cause of *Tetrick*, *Hess* and *Nay* against him, of the sale made by *Downs* to the complainant of the parcel of land purchased by him of *Downs*.

A final decree was rendered in December, 1860. The court determined that the complainant had no relief against the bonds assigned by *Downs* to *Conaway* and *H. Sturm*; that *Downs* made a deed to complainant for the lot of land set out by the report of the surveyor as being a part of that purchased by him from *Downs*, and not by him sold to other parties; and that there being no such purchase money lien in favor of *Jesse Sturm* as ought to be enforced against the lot of land sold by *Downs* to complainant, *Parish*, that he ought to refund the sum of two hundred and twelve dollars and thirteen cents, and judgment was given accordingly, together with costs against *Sturm* in favor of complainant, and also in favor of *Conaway* and *H. Sturm*.

The writing executed by *Jesse Sturm* to complainant, *Parish*, is as follows:

"WHEREAS, There was due *Jesse Sturm* from *George Downs* two hundred and twelve dollars and thirteen cents, it being the balance of principal and interest, to the 7th day of February, 1855, on the property of said *Sturms* sold to said *George Downs* in *Worthington*, the said property was afterwards sold to *Richard Parish* by *George Downs*, the said *Parish* executed his note to *Jesse Sturm* for the above amount, it being the remainder of the purchase money on the above property, and believing him to be the lawful one to pay the money to in order for me to get my deed, and the said *Downs* gave me an order to said *Sturms* for a deed, which deed I have received, there is others claiming on the property, and if it should prove that any other portion of the property should be liable, that liability shall be refunded to the said *Parish* with interest, August 9th, 1855.

JESSE STURM."

On the reference before the master it appeared in the evidence of *Downs*, that he sold the land to *Parish* before

the sale to *Patton* and *Sharp*; the same matter was proven by *Henry Pride* on the second reference; some evidence was brought forward tending to prove that the sales to *Patton* and *Sharp* were made prior to the sale to *Parish*, but no writing or memorandum was had between them and *Downs*; the master reported the sale to *Parish* as having been first made.

Defendant, *Sturm*, prayed an appeal to this court, which was granted.

*E. B. Hall* for the appellant insisted:

1st. That if the parcel sold to *Parish* was even the first sold, it was not competent to decree against appellant as was done in said final decree, without first ascertaining that the other parcels were of value sufficient to pay appellant's claim for unpaid purchase money.

2d. That the decree of June 29th, 1860, should have required the commissioner to ascertain if appellant knew, not only of the fact, but also the order as to time of the sales of the several parcels sold, when the bill of *Hess*, *Tetrick* and others, was taken for confessed, and when he conveyed the several parcels, other than that sold to *Parish*.

3rd. That under the circumstances, and from the evidence in the case, it is shown that if any other than the *Parish* parcel *was* first liable for appellant's claim, appellant was honestly mistaken and misled by the parties, who, by the decree in this cause, are made to profit by deceiving appellant in the premises, and it was error to decree that even as to the parcels conveyed to others than *Parish*, appellant had no lien for his purchase money unpaid, it appearing that none of said parties had been misled, deceived, or suffered any thing on account of any mistake or misapprehension of appellant.

4th. That the court was in error in overruling the exceptions of appellant to the several reports of the master commissioner in the cause, dated respectively, October 4th, 1854, June 30th, 1857, and September 25th, 1860.

5th. That the evidence in the cause did not warrant or

134    COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,        Sturm vs. Parish, et. al.        1865.

sustain the finding of the commissioner, and the decree of the court thereon, as to the dates and order of the sale of the several parcels of said land, but on the contrary demonstrated and proved that the parcel sold to *Parish* was the last sold, and that the transaction reported by the commissioner, as a re-sale of one parcel, by *Patton* to *Downs*, and by him again to *Patton*, was no sale or re-sale, but a nullity, there being no note or memorandum in writing in the case, signed by or for *Patton*, and no payment or possession by *Downs*.

6th. That it was error to decree costs against appellant, in favor of complainant and his co-defendants, *Conaway* and *Henderson Sturm*, the latter of whose claim had been paid by complainant before decree, and nothing in the cause to show that he was a necessary party, certainly not made so by appellant, who brought no suit, and made no costs necessary by any party.

7th. The refunding receipt or paper writing from *Sturm* to *Parish* of the 9th of August, 1855, if at all intelligible, is a contract or promise without a consideration, and therefore void.

*G. H. Lee* and *B. Despard* submitted in substance, the following written argument for the appellee, *Conaway* :

The first point to which we will advert is suggested by the circumstances under which Conaway took the assignment of the two bonds of complainant. He states that when the sale was proposed by Downs, he first saw complainant and learned from him that they were just and would be paid, and this he repeated after he, Conaway, had taken them, and that as he had thus been induced to take the bonds, complainant ought not now to be permitted to resist payment. We submit that this allegation is sufficiently sustained by the evidence. Downs proves that he offered the bonds to Conaway in Worthington, where Parish lived, that Conaway declined taking them without first seeing Parish, and ascertaining if he was willing he should purchase them; that he did see Parish, and had a conversation with him, and then bought the notes of Downs; and although he

does not remember the conversation that took place between Conaway and Parish, the inference is irresistible, that it was as Conaway states, and that he was thereby induced to buy the bonds. Koon proves that Parish told him he had said to Conaway, that the bonds were right, and that he would pay them.

It is in vain to say, that Parish might not then have known of his equity. He knew the facts; he knew he had not acquired the legal title to the property; it was his duty to inform himself of his title, and whether he had any grounds connected with it upon which to refuse payment of his bonds, and to warn a party in treaty for them not to take them. If he needed further information than he already had, Downs was on the spot and doubtless willing to give it.

That a party who encourages another to purchase a subject such as his bond, or even real estate, in which he has an interest, or even permits another to purchase, by standing by in silence, without making known his equity, will not afterwards be allowed to set it up against the purchaser, is a familiar doctrine, for which the authorities are numerous. We cite; 1 Sto. Eq. Jur. § 385. § 386; *Hunzden* v. *Cheyney*, 2 Vern., 150; *Backner, &c.* v. *Smith, &c.*, 1 Wash., 296, 300; and *Hoomes ex.* v. *Smock*, 1 Wash., 389, 392, cases of transfer of gaming securities; *Davis's ad.* v. *Thomas*, 5 Leigh., 1, case of a transfer of a note; *Taylor's ad.* v. *Chowning*, 3 Leigh., 654, opinion of Carr, J.; *Mayo* v. *Giles ad.*, 1 Munf. 583; *Wendell's ex.* v. *Van Renssalaer*, 1 John, Ch. Rep., 354. To show that in such a case as this, it is the duty of the party to inform himself as to his title, before he encourages a purchase by another, and, as said by Lord Keeper North, that it is "a negligent thing" in him not to do so, we refer to *Hobbs* v. *Norton*, 1 Vern., 136; *Stowes* v. *Barker*, 6 John. Ch. Rep. 166; *Lomax* v. *Picot*, 2 Rand. 247, 262, 271, 274; *Hundsden* v. *Cheyney*, 2 Vern, 150; *Feasdale* v. *Feasdale*, Sel. Cas., ch. 59; 1 Fonbl., 161., n., S. C.

Parish, by his assurances that the bonds were good and would be paid, having misled Conaway, lulled him into a false security and induced him to part with his money and

take the assignments, cannot, now that Downs has become insolvent and Conaway's recourse to him would be fruitless, be permitted to turn around and say that he has an equitable defence against them. If a loss is to be sustained, *he* and not Conaway is the one who should bear it, or look to the common indemnifier Downs for reimbursement. We submit that the equitable estoppel *in pais* is fully made out.

We pass to the questions having reference to the order in point of time in which the several sales of Downs were made, and we maintain that upon a proper analysis of the testimony, there can be no doubt whatever that the commissioner was right in the conclusion to which he came in his second report, reiterated in his third and accepted and adopted by the court below in its final decree, that the sale to Parish did precede those to Patton, Sharp and H. Nay. The only testimony that tends to raise any doubt upon the point is that of Patton, H. Nay and perhaps J. B. Nay. But Patton and Henry Nay were both purchaser of portions of the property of Downs, both were parties to the cause, and both had a plain and direct interest in the result of the suit. Both were interested to divert Sturm's lien from their lots by devolving it upon that purchased by Parish; and although they had sold the lots, yet if the lien had been asserted against them in the hands of the purchasers, there would have been a failure *pro tanto*, of the consideration which Martin, the purchaser from Patton, was to receive for his money, and Nay was liable on the covenants of general warranty in his deed to Hall, the trustee, for his lots. Their depositions were duly and formally excepted to on this ground in the court below, and they were plainly inadmissible as evidence in this case. We therefore pass them by without further comment.

As to J. B. Nay, it will be found that his testimony is very vague and unsatisfactory. He speaks of conversation between Downs and Sharp, which he thinks he heard in the winter of 1850–1, in which the purchase of a lot by Sharp, of Downs, was spoken of. No writing was produced, nor was he called upon as a witness to any contract then

made. His testimony amounts to nothing more than a vague recollection of a loose conversation that took place upwards of eight years before he gave his deposition, and little or no weight can be given to it.

On the other hand, when we come to examine the other testimony in the cause, we find every shadow of doubt that might be raised by the evidence of J. B. Nay, and even that of Patton and H. Nay, (if it could be considered by the court,) fully removed.

Downs was the man who made all the sales, and who it must be supposed knew best about his sales and the times at which they were made. He says he sold the tavern house property to Parish in March, 1851, and that after he made that sale, he sold the lot No. 2 to Patton. He explains that he had previously sold this property to Patton for four hundred dollars, but had re-purchased it, and he is speaking of the second and final sale to Patton. He says he sold the lot that Sharp got in the winter of 1851–52, and that which Henry Nay purchased in the summer of 1852. This witness's liability is the same upon whomsoever the burden may be cast, his interest is perfectly equally balanced, and his testimony is not excepted to by any body: And he is abundantly confirmed by other witnesses.

Pride says he removed to Worthington in September, 1851, and lived there till 1857, that he was acquainted with the Downs property, and was cognizant of most of the trading in real estate in the place during his stay. He says the sales to Patton and Sharp were made in the winter of 1851–52, and that to H. Nay was the last sale made by Downs. In his second deposition, he identifies the time of the sale to Patton as in the winter of 1851–52, by the circumstance, that during that winter he was working in a shop on that lot, (No. 2,) and Downs and Patton came into the shop and notified him that on that day Downs had sold said lot, (No. 2,) to Patton. He speaks of the sales of which he was personally cognizant; he does not speak of the sale to Parish, manifestly because that sale took place the spring before he removed to Worthington.

Davis thinks that the sale to Sharp was in 1851, but he states explicitly that the first sale he had knowledge of was the sale of *the tavern house property*. This was the lot sold to Parish, No. 3. The last sale he knew of was of the lot sold to Sharp, and he was present when it was made.

Fortney, whose deposition was taken twice, was interested in lot No. 2, the lot sold to Patton, and his evidence was objected to on that account. He however proves nothing material. The sale to Patton spoken of by him was the first sale in 1849, and not the final sale in 1851, after Downs' re-purchase, which is the subject of discussion here.

Millan deposes touching the sale to Sharp. He is not certain as to the year, thinks it was in 1851, but it might have been in 1850 or 1852. He states however that the sale to Parish was before the sale to Sharp, and he adds a fact which is conclusive, to wit: that Parish was keeping tavern in the tavern property when the sale to Sharp was made.

Sharp himself is examined. He thinks he purchased in the fall of 1851, though he is not positive, but he states as Millan did, that when he bought his lot, Parish was keeping tavern in the property he bought of Downs: and it is not pretended that Parish ever kept the house until after his purchase.

Upon a review of this testimony, there can be no difficulty in arriving at a just conclusion. There is an apparent confusion arising from some of the witnesses speaking of a sale to Patton in 1849. This is easily explained: Downs did sell first to Patton in 1849, but he took the property back, and afterwards re-sold it to Patton in the fall of 1851, or early in the winter of 1851–1852. It is idle to talk about the sale from Patton to Downs being a nullity for want of a note of the same in writing. According to Patton *there was no writing between him and Downs about the first sale*. The re-sale by Patton was then at least as good as that, and created quite as good an equity. It certainly sufficed to rescind what was itself a mere verbal sale. Patton took Down's

note for the purchase money, and Downs got possession of the property, for although he may not actually have occupied the dwelling house himself, the possession of the tenant was his possession, especially as he was never bound in writing to the first sale. As Downs failed to pay his notes as they matured, Patton concluded to re-purchase the property, and surrendered Downs' notes for it. This however, it is clearly proven, was not until after the sale to Parish. It is submitted that the last sale must be taken as the sale in question here, and that the parties interested cannot mend their hand by falling back upon the rescinded sale of 1849.

As to the sufficiency of the property other than that sold to Parish to pay Jesse Sturm's lien, there can be no question. Patton paid four hundred dollars for his lot when he first purchased it, before it was improved, Sharp paid seventy-five dollars for his, and H. Nay fifty dollars for his. All these lots were improved afterwards by dwelling houses, stores, shops, stables, &c., and there can be little doubt that any one lot with the improvements upon it would have sold for enough to pay off Sturm's lien, amounting to the inconsiderable sum of one hundred and eighty-nine dollars and twenty-four cents.

The principle that where successive sales have been made of portions of a subject upon which there is a paramount lien, the burden must be borne, by the later alienees to the relief of the earlier, and that there will be no contribution amongst the alienees, is impliedly conceded by the appellant's counsel, in the petition for the appeal, and indeed it cannot at this day be controverted. We will, however, refer to a few cases, in which it has been fully recognized and enforced. We cite *Gill* v. *Lyon*, 1 John. Ch. Rep., 447; *Clowes* v. *Dickenson*, 5 John. Ch. Rep., 235; *Nailer* v. *Stanley*, 10 Serg. & Rawle, 450; *Conrad* v. *Harrison*, 3 Leigh., 532; *McClung* v. *Beirne*, 10 Leigh., 394; *Henkle's ex.* v. *Allstadt*, &c. 4 Grat., 284; *Jones, &c.* v. *Myrich's ex.*, 8 Grat., 179.

Assuming then that the lots sold to Patton, Sharp and H. Nay, were liable to Sturm's lien before that sold to Parish could be subjected, what is the effect of Sturm's voluntarily

conveying the former to those parties, upon his lien? Clearly to extinguish it as to the latter. It was not for him to undertake to decide between the conflicting equities of the parties; knowing that there had been successive sales of different portions of the property, and that he was only bound to make one deed for the whole, and not that until his purchase money was paid, he should have called upon the court to say how, and to whom he should make deeds, especially when he had the opportunity to do so in the case of Tetrick, &c., by answering the bill, bringing the facts before the court, and thus enabling it to call the parties interested before it, and adjust the rights of all. If he chose to convey parcels of the lands to some of the purchasers, he did it at his risk, and if those which he conveyed were of the later sales, he clearly waived and abandoned his lien upon the part held under the earlier.

But if there even were any difficulty whatever about the equities of those parties, Parish has effectually resolved it. He has cut the Gordian knot. He had appealed to the circuit court as the proper tribunal to adjust the conflicting equities of the parties, but not content to await what he considered the too slow process of that court, he comes forward and for the purpose of inducing Jesse Sturm to deliver the deed which he had executed for his lot, but which he withheld until his purchase money was paid, pays him up the full amount of the balance. And there we say is the end of this controversy so far as Conaway and H. Sturm were concerned. By paying the balance of the purchase money, he extinguished Jesse Sturm's lien, and with it, his equity, if any he had, against the payment of his bonds held by Conaway and H. Sturm. No new equity did or could spring from that payment, as against them. His only recourse is to Jesse Sturm upon the indemnity which he chose to give him. The court has in effect decided (and it could not come to any other conclusion) that the property sold to Patton and to Sharp was liable to Sturm's lien before that sold to Parish could be subjected, and as Sturm had chosen to relinquish his lien upon the former he could not compel Parish to pay

him his unpaid purchase money; and as he had received it of Parish, but had agreed to refund it in case the property upon which he had released the lien was first liable, the court could not do otherwise than decree against him for the amount. In conclusion, we will glance briefly at the grounds of error assigned in the petition.

1st. Conaway has perhaps no interest in this question, but we think it sufficiently appears, that the lots, other than that sold to Parish, were abundantly sufficient to satisfy Jesse Sturm's lien.   We have, however, already said enough upon this point.

2d. It was not important to inquire if Jesse Sturm knew the order in point of time in which Downs' sales were made. It was enough that he knew successive sales had been made.   It was not for him to decide upon the equities between the parties.   If he chose to do so, he did it at his peril.

3d. If Jesse Sturm was misled, he was not misled by Conaway.   Conaway did and said nothing that could influence him one way or another.   But in fact he was not misled.   If he chose to receive his money when tendered by Parish, and deliver the deed, with the understanding that if the other property was liable before Parish's lot, the money should be refunded, then that ascertained to be the case by the decree of the court, he certainly cannot complain that he is required to do what he voluntarily undertook. The charge of deception and imposition is utterly unfounded.

4th and 5th. We have already considered these points, and have nothing further to add to what has been said as to them.

6th. This ground of error is founded in a mistake of fact on the part of appellant's counsel.   The decree for costs in favor of Conaway and H. Sturm was not against his client, but against Parish, the complainant in the cause; and of this Parish does not complain, and Jesse Sturm cannot. Moreover, an error as to costs merely, in a chancery cause, is no ground for a reversal of the decree. *Ashby* v. *Kiger*, 3 Rand., 165.

On the whole, we confidently submit that the decree, so far as it concerns Conaway, is in all respects right, and must be affirmed.

BERKSHIRE, President, delivered the opinion of the court.

The only error complained of by the appellant, is that of the final decree which requires him to refund and pay to the appellee, Parish, the sum of 212 dollars and 13 cents, with interest from the 20th of February, 1855, it being the residue of the purchase money due the appellant from the appellee Downs, which Parish had on that day paid to the appellant.

At the time of the payment, it appears that both Parish and Sturm knew that Downs had previously sold the residue of the premises in controversy to the appellees Patton and Sharp; and Parish had also filed his amended bills alleging the fact, and making them, and those claiming under them, parties to the cause; and a master of the court to whom the cause had been referred, had also filed his report stating distinctly that Downs had so sold to Patton and Sharp, and that the parts sold to them were liable for the residue of the purchase money due the appellant.

Previous to this time, to wit, on the 3d day of February, 1855, Sturm, as appears from his answer to the last amended bill, conveyed the part so purchased by Patton, to his vendee and retained no lien for the purchase money, and on the same day he received the purchase money from Parish, he also conveyed to him the part so purchased from Downs, and, of course, retained no lien for purchase money, as the same was then paid. A decree by default had also been rendered against him in the case of Tetrick, Hess and Nay, requiring him to convey to them the part so purchased by Sharp from Downs, which deed he subsequently, and before the final decree in the case, made to Tetrick, Hess and Nay, without retaining a lien for purchase money.

The appellant having thus conveyed the part sold to Parish and Patton, and being bound by the decree to convey the residue to Tetrick, Hess and Nay, and having also

COURT OF APPEALS OF WEST VIRGINIA. 143

Jan'y Term, Sturm vs. Parish, et. al. 1865.

received the residue of his purchase money, which he was not bound to refund, the question of the vendor's lien was no longer open. And the appellee, Parish, having by the payment of the money due to Sturm, and receiving his deed, taken upon himself the adjustment of the equities and pri-orities of liens between the parties, independently of the court, whose aid and direction he had already invoked for the purpose, the whole controversy would have been thus at an end if the case had stopped here. But on the 7th day of August, 1855, some six months after the payment by Parish to Sturm, the latter signed the paper "N" filed as an exhibit with the last amended bill. This paper in itself is scarcely intelligible, but taken in connection with other facts in the cause, I think it amounts to a promise on the part of Sturm to refund to Parish the amount he paid Sturm, in the event it should thereafter turn out that the parts sold to Patton and Sharp should be liable for the same.

The appellee, Parish, having by his own act thus practically reduced the controversy to a contest between himself and the appellant, subsequently filed another amended bill, charging that the sales to Patton and Sharp were after the sale to him, and consequently would have been first liable for the unpaid purchase money to Sturm; and also alleging the signing of the paper "N" by Sturm, and claiming a right to recover against Sturm by virtue of the promise contained therein, and asking a decree against him accordingly.

Sturm, in his answer to the amended bill, admits that he signed the paper at the instance of Parish, but insists that the sales to Patton and Sharp were before the sale to Parish, and therefore *first* liable to his purchase money, and this was the understanding he had when he received his purchase money and made the deed to Parish.

The cause being again referred to the master to ascertain these facts, he reported that the first sale was made to Parish, and that the sales to Patton and Sharp were subsequent to sale to Parish, and both made about the same time.

The appellant excepted to this report, which exceptions were overruled.

The counsel for the appellant insisted here that the exceptions to the report should have been sustained, and that the conclusions of the commissioner were not justified by the evidence.   I think, however, that the weight of the testimony sustains the report, and that the exceptions were, therefore, properly overruled.

It was further argued by the counsel for the appellant, that the paper "N" showed a parol contract or promise *without consideration*, and therefore null and void, and as the case must hinge on this fact, it becomes an important question.

That a parol contract or promise without consideration is void, is too well established to require any comment.   A valuable consideration consists, ordinarily, in money or its equivalent, or marriage; but it is likewise held sufficient, to support such a contract or promise, if by making the promise the promisor is to receive some advantage or benefit, or the *promisee* may sustain some injury or damage.   1 Parsons on Contracts, 353 to 360.

Applying these principles and tests to the present case, it is clear, I think, that there was no consideration whatever, moving from the promisee to the promisor; for it is not pretended there was any pecuniary consideration; while the promisor Sturm, instead of being benefitted by the promise, (if bound by it,) would have been injured; and the promisee Parish, instead of being injured, would have been directly benefitted.

I think, therefore, that the decree, in so far as it requires the appellant to refund, &c., is erroneous, and for this cause and to this extent only, should be reversed.   But as Parish in fact, paid the money for Downs, he should stand in the shoes of Sturm and have a decree over against Downs for the amount thereof.

DECREE REVERSED.