# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

**September 2015 Term**

_____

**No. 14-0921**

_____

**FILED**

**November 18, 2015**

**released at 3:00 p.m.**

RORY L. PERRY II, CLERK

SUPREME COURT OF APPEALS

OF WEST VIRGINIA

**CHESAPEAKE APPALACHIA, L.L.C.,
RED SKY LAND, L.L.C.,
RED SKY—WEST VIRGINIA, L.L.C., and
TERRY L. MURPHY,**
**Defendants below, Petitioners**

**v.**

**CECIL L. HICKMAN,**
**Plaintiff below, Respondent**

**AND**

_____

**No. 14-0922**

_____

**GEOLOGICAL ASSESSMENT & LEASING, and
WILLIAM CAPOUILLEZ,**
**Defendants below, Petitioners**

**v.**

**CECIL L. HICKMAN,**
**Plaintiff below, Respondent**

**AND**

_____

No. 14-0923
_____


**GREAT LAKES ENERGY PARTNERS, LLC,
N/K/A RANGE RESOURCES—APPALACHIA, LLC,
Defendant below, Petitioner**


**v.**


**CECIL L. HICKMAN,
Plaintiff below, Respondent**

_____


**Appeals from the Circuit Court of Ohio County
The Honorable David J. Sims, Judge
Civil Action No. 12-C-11**


**AFFIRMED, IN PART, REVERSED IN PART,
AND REMANDED**


_____


**Submitted: September 15, 2015
Filed: November 18, 2015**

**Timothy M. Miller, Esq.**
**Mychal S. Schulz, Esq.**
**Babst Calland Clements & Zomnir, P.C.**
**Charleston, West Virginia**
**Counsel for Petitioners Chesapeake**
**Appalachia, L.L.C.; Red Sky Land,**
**L.L.C.; Red Sky-West Virginia, L.L.C.;**
**and Terry L. Murphy**

**Robert C. James, Esq.**
**Flaherty Sensabaugh Bonasso PLLC**
**Wheeling, West Virginia**
**Counsel for Petitioners Geological**
**Assessment & Leasing and William**
**Capouillez**

**Gregory A. Gellner, Esq.**
**Gellner Law Offices**
**Wheeling, West Virginia**
**Counsel for the Respondent**

**Kenneth J. Witzel, Esq.**
**Barnes Dulac Watson**
**Pittsburgh, Pennsylvania**
**Counsel for Petitioner Great Lakes**
**Energy Partners, LLC, now known as**
**Range Resources—Appalachia, LLC**

**JUSTICE KETCHUM delivered the Opinion of the Court.**

**JUSTICE BENJAMIN, deeming himself disqualified, did not participate in the decision of this case.**

SYLLABUS BY THE COURT

1.      "An oil and gas lease (or other mineral lease) is both a conveyance and a contract.  It is designed to accomplish the main purpose of the owner of the land and of the lessee (or its assignee) as operator of the oil and gas interests: securing production of oil or gas or both in paying quantities, quickly and for as long as production in paying quantities is obtainable."  Syllabus Point 1, *McCullough Oil, Inc. v. Rezek*, 176 W.Va. 638, 346 S.E.2d 788 (1986).

2.      "Under the Federal Arbitration Act, 9 U.S.C. § 2, a written provision to settle by arbitration a controversy arising out of a contract that evidences a transaction affecting interstate commerce is valid, irrevocable, and enforceable, unless the provision is found to be invalid, revocable or unenforceable upon a ground that exists at law or in equity for the revocation of any contract."  Syllabus Point 6, *Brown v. Genesis Healthcare Corp.*, 228 W.Va. 646, 724 S.E.2d 250 (2011), reversed on other grounds by *Marmet Health Care Ctr., Inc. v. Brown*, 132 S.Ct. 1201 (2012).

3.      "Nothing in the Federal Arbitration Act, 9 U.S.C. § 2, overrides normal rules of contract interpretation.  Generally applicable contract defenses—such as laches, estoppel, waiver, fraud, duress, or unconscionability—may be applied to invalidate an arbitration agreement." Syllabus Point 9, *Brown v. Genesis Healthcare Corp.*, 228 W.Va. 646, 724 S.E.2d 250 (2011), reversed on other grounds by *Marmet Health Care Ctr., Inc. v. Brown*, 132 S.Ct. 1201 (2012).

4.     "Under the Federal Arbitration Act, 9 U.S.C. § 2, and the doctrine of severability, only if a party to a contract explicitly challenges the enforceability of an arbitration clause within the contract, as opposed to generally challenging the contract as a whole, is a trial court permitted to consider the challenge to the arbitration clause. However, the trial court may rely on general principles of state contract law in determining the enforceability of the arbitration clause.  If necessary, the trial court may consider the context of the arbitration clause within the four corners of the contract, or consider any extrinsic evidence detailing the formation and use of the contract."  Syllabus Point 4, *State ex rel. Richmond American Homes of West Virginia, Inc. v. Sanders*, 228 W.Va. 125, 717 S.E.2d 909 (2011).

5.     "When a trial court is required to rule upon a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1–307 (2006), the authority of the trial court is limited to determining the threshold issues of (1) whether a valid arbitration agreement exists between the parties; and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement."  Syllabus Point 2, *State ex rel. TD Ameritrade, Inc. v. Kaufman*, 225 W.Va. 250, 692 S.E.2d 293 (2010).

6.     "Fraud in the procurement of a deed or contract always renders it voidable."  Syllabus Point 1, *Jones v. Comer*, 123 W.Va. 129, 13 S.E.2d 578 (1941).

7.     "As a general rule, one who enters into a contract or performs some act while laboring under a mistake of material fact is entitled to have the transaction or

the act set aside in a court of equity[.]" Syllabus Point 1, in part, *Webb v. Webb*, 171 W.Va. 614, 301 S.E.2d 570 (1983).

8. "A meeting of the minds of the parties is a *sine qua non* of all contracts." Syllabus Point 1, *Martin v. Ewing*, 112 W.Va. 332, 164 S.E. 859 (1932).

9. "A court may not direct a nonsignatory to an agreement containing an arbitration clause to participate in an arbitration proceeding absent evidence that would justify consideration of whether the nonsignatory exception to the rule requiring express assent to arbitration should be invoked." Syllabus Point 3, *State ex rel. United Asphalt Suppliers, Inc. v. Sanders*, 204 W.Va. 23, 511 S.E.2d 134 (1998).

10. A signatory to an arbitration agreement cannot require a non-signatory to arbitrate unless the non-signatory is bound under some traditional theory of contract and agency law. The five traditional theories under which a signatory to an arbitration agreement may bind a non-signatory are: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.

Justice Ketchum:

This case presents three appeals of an August 7, 2014, order by the Circuit Court of Ohio County. The appeals have been consolidated for consideration.

The complex issues in this case revolve around four overlapping leases to extract oil and gas from land owned by the plaintiff. Each lease has an arbitration clause. The plaintiff brought an action seeking a declaration as to which lease was controlling as to various defendants, and seeking damages from the defendants. The circuit court's order voided two of the leases, addressed the substantive terms of two others, and compelled the parties to arbitrate any remaining claims by the plaintiff.

As we discuss below, we affirm the circuit court's order, in part, and reverse the order, in part, and remand the case for further proceedings.

**I.**
**FACTUAL AND PROCEDURAL BACKGROUND**

Plaintiff Cecil L. Hickman owns a ¼ undivided interest in a 143.77 acre tract in Ohio County, West Virginia. Mr. Hickman does not live on the tract, but rather lives in Columbus, Ohio. He amicably shares ownership of the tract with his three siblings.[1] This case arises from four different leases for the oil and gas underlying the Ohio County tract, and concerns the application of the arbitration clauses contained within each lease.

---

[1] His siblings are John Mark Hickman; Lawrence Grant Hickman; and Carol Sue Criswell.

1

Defendant William Capouillez is a geologist who runs a small company, defendant Geological Assessment & Leasing.[2] Mr. Capouillez represents landowners in their lease negotiations with companies who seek to lease the owner's land to drill for oil and gas. Mr. Capouillez ostensibly negotiates lease terms favorable to landowners, and helps landowners negotiate higher bonus and royalty payments.

Plaintiff Hickman and his siblings appear to have first been represented in oil and gas lease negotiations by Mr. Capouillez in 2001. While the resulting lease is not critical to this case, Mr. Hickman contends that the way the lease was signed in 2001 established a pattern that guided future expectations with Mr. Capouillez. Specifically, in late 2001, representatives of an oil and gas company[3] offered to meet with Mr. Hickman and his three siblings to sign a lease of the Ohio County tract. Mr. Hickman could not attend the meeting, so the representatives met with the three siblings and Mr. Capouillez, all of whom signed the lease. Someone then mailed that signed lease to Mr. Hickman in Ohio. Mr. Hickman signed the lease and mailed it back.

---

[2] We provide additional detail of how Mr. Capouillez operated in a companion case, *Geological Assessment & Leasing v. O'Hara*, ___ W.Va. ___, ___ S.E.2d ___ (No. 14-1210, November 18, 2015). In that separate case (which similarly involves three appeals consolidated for consideration), various landowners brought suit against Mr. Capouillez (and his company) alleging that his actions, while representing landowners in lease negotiations, constituted the unlawful practice of law. The landowners sought relief in circuit court to remove provisions beneficial to Mr. Capouillez (and his company) from the resulting leases. In response, Mr. Capouillez asserted he was entitled to arbitrate the landowner's suits pursuant to the terms of the resulting leases.

[3] The December 19, 2001 lease, with a company called The Canton Oil and Gas Company, is included in the record.

Thereafter, Mr. Hickman received his one-quarter share of the payments from the oil and gas company, as required by the 2001 lease. Mr. Hickman asserts it is important to remember that he and his three siblings all signed the same document, and that the start date and the end date for the 2001 lease were the same for all four siblings.

We now turn to the four oil and gas leases, each of which included an arbitration clause, that are at issue in this case.

### A. *First Lease: December 2005*

The first lease at issue in this case was signed only by Mr. Hickman's three siblings in December of 2005.

It appears that Mr. Capouillez contacted Mr. Hickman and his three siblings again sometime in late 2005, because a new company – defendant Great Lakes Energy Partners, LLC (now known as Range Resources—Appalachia, LLC, and hereinafter called "Range Resources") – had sent an "offer of lease" to Mr. Capouillez.[4] Mr. Hickman and his siblings were invited to meet with representatives from Range Resources at the Bethany, West Virginia, Fire Department on December 21, 2005. However, only the three siblings attended the meeting. Mr. Hickman, still a resident of Columbus, Ohio, could not attend because of work commitments.

---

[4] We note that Mr. Hickman and his siblings signed the prior lease on December 19, 2001, and the prior lease was to remain in force for five years – that is, until December 19, 2006. We find nothing in the parties' briefs or the record to explain how and why, after only four years, Mr. Capouillez presented a new lease to Mr. Hickman and his siblings.

3

Mr. Hickman says he knew of the general terms and conditions of the Range Resources lease and intended to join his siblings on the lease. Mr. Hickman and his siblings also claim they thought they were simply renewing the 2001 lease. Further, Mr. Hickman and his siblings assert they believed they were leasing the property together, and they expected that the lease time frames would be identical for all four siblings.

The 2005 lease was in a similar format, and was presented in a similar way, to the lease they had signed in 2001. The lease explicitly provided it was between Range Resources and all four siblings. The lease term was for five years (that is, until December 2010), but could be extended on a year-to-year basis if Range Resources made "a bona fide attempt to secure or restore" the production of oil and gas. The lease required the payment of bonuses and royalties in equal shares to all four siblings.

The lease also identified Mr. Capouillez as a "consultant" for Mr. Hickman and his three siblings. Rather than the four siblings paying Mr. Capouillez for his negotiation efforts, the lease contained provisions requiring the oil and gas company to pay a small share of the bonuses and royalties directly to Mr. Capouillez. The lease also prohibited the landowners and the oil and gas company from modifying the lease to Mr. Capouillez's detriment.

Important to this appeal, the December 2005 lease contains an arbitration clause. The clause provides that "[a]ny controversy or claim arising out of or relating to this Lease . . . shall be ascertained and settled" by arbitration.[5]

In addition to the lease, at the December 21, 2005, meeting the three siblings were presented with a "memorandum of lease," which was a summary of the lease that the oil and gas company intended to publicly file with the Clerk of the County Commission of Ohio County. The memorandum of lease excluded the specific bonus and royalty amounts. However, the memorandum of lease provided that the lessors of the Ohio County tract were all four siblings, including Mr. Hickman, acting jointly.

Both the December 2005 lease and the memorandum of lease identify Mr. Hickman as one of the four lessors of the tract; both the lease and the memorandum of lease had four signature lines under the heading "Lessor." On December 21, 2005, the

_____

[5] The arbitration clause in the December 2005 Range Resources lease provides:

> 29.1   Any controversy or claim arising out of or relating to this Lease, or the breach thereof, shall be ascertained and settled by three (3) disinterested arbitrators in accordance with the rules of the American Arbitration Association, one thereof to be appointed by the Lessor, one by the Lessee, and the third by the two (2) so appointed aforesaid, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. Arbitration proceedings hereunder shall be conducted at the county seat or the county where the lease or action occurred which is cause for the arbitration, or such other place as the parties to such arbitration shall all mutually agree upon. The cost of such arbitration will be borne equally by the parties.

5

three siblings signed the lease and the memorandum of lease, leaving the fourth line on each document blank. Mr. Capouillez also signed the lease on a line marked "Consultant," and a representative for Range Resources signed on a line marked "Lessee."

This case has its genesis, in part, on an unfortunate problem: Mr. Hickman never signed the December 2005 lease (or the memorandum of lease) with Range Resources.

Both Mr. Hickman and his siblings were under the impression that "someone" – probably defendant Range Resources – would mail the signed lease to Mr. Hickman so he could apply his signature to the end. Mr. Hickman says that, sometime in early 2006 (he is unsure when or how often), he realized he had not received the lease payments that had been received by his siblings, and so he called Mr. Capouillez and asked when he would be receiving the lease. Mr. Capouillez never returned his calls, and Mr. Hickman never received the December 2005 lease to sign.

Without procuring Mr. Hickman's signature, on June 2, 2006, Range Resources recorded the memorandum of lease (signed by the three siblings) with the Ohio County Clerk. The memorandum gave the public notice that Mr. Hickman and his three siblings were bound by the terms of a joint oil and gas lease with Range Resources, dated December 21, 2005, and extending for five years (or longer if Range Resources made good faith efforts to produce oil and gas from the tract).

6

## B. *Second Lease: July 2006*

Sometime in July 2006, Range Resources sent a new, unsigned and undated oil and gas lease to Mr. Hickman. Range Resources also sent a new memorandum of lease, and asked Mr. Hickman to sign both documents and have his signature notarized. Both documents indicate the lease was for a five-year term. The documents also contained extension language identical to that in the December 2005 lease that may be important in the instant case. The lease states that, if the lessee of the tract made "a bona fide attempt to secure . . . the production" of oil and gas by drilling a well, then the lease could continue on a year-to-year basis.

The July 2006 lease contains the same arbitration clause as that contained in the December 2005 lease.[6] The clause provides that "[a]ny controversy or claim arising out of or relating to this Lease . . . shall be ascertained and settled" by arbitration.

Mr. Hickman claims that he signed both the lease and the memorandum of lease, but he did not date the documents. A notary public notarized Mr. Hickman's signature on July 19, 2006. Thereafter, Mr. Hickman mailed the signed documents to Range Resources.

Mr. Hickman says he thought he was agreeing to the same lease terms that his siblings had agreed to, namely that the effective date would be the same as his siblings: December 21, 2005. It is Mr. Hickman's contention that someone at Range Resources fraudulently filled in the blanks for the effective date, altering the parties'

---

[6] For the full text of the arbitration clause, see *supra* at footnote 5.

7

agreement and making the effective date the same as the day Mr. Hickman's signature was notarized. In other words, both the lease and the memorandum of lease provide that the lease between Range Resources and Mr. Hickman became effective on July 19, 2006, and extended for five years. Mr. Capouillez later signed the lease as "consultant."

To further confuse matters, the memorandum of lease incorrectly states that the leased, Ohio County tract was located in Brooke County, West Virginia. Hence, Range Resources filed the memorandum of lease with the Brooke County Clerk, giving the public notice that only Mr. Hickman, "single, with ¼ interest," had leased a property in Brooke County to Range Resources "for a term commencing 19th of July, 2006 and terminating five years thereafter" unless the lessee commenced drilling a well to secure production of oil and gas.

### C. *The 2010 Assignment to Chesapeake*

On October 19, 2010, Range Resources assigned both the December 21, 2005, and the July 19, 2006, leases to defendant Chesapeake Appalachia, L.L.C. ("Chesapeake"). As to the 2006 lease, the assignment documents in the record identify Mr. Hickman, alone, as the lessor; identify the lease date as "20060719" (July 19, 2006); and correctly locates the tract leased as being in Ohio County.

### D. *Third Lease: January 2011*

The third lease at issue involves Chesapeake, and was signed by all four siblings in January 2011. Defendant Capouillez and his company, Geological Assessment & Leasing, did not participate in the lease negotiations.

Defendant Terry Murphy was a landman working for defendants Red Sky Land, LLC, and Red Sky – West Virginia, LLC (collectively "Red Sky"). Red Sky was employed as an agent for Chesapeake to negotiate various oil and gas leases.

The first Range Resources lease (which had been assigned to Chesapeake in October 2010) expired on December 21, 2010, without oil or gas production taking place on the Ohio County tract of land. Internal e-mails between Chesapeake employees and Mr. Murphy in November 2010 indicated that Chesapeake knew the lease was about to expire. Furthermore, Chesapeake believed that the Ohio County tract was a "high priority acquisition" and was a required drill site for the area. However, Chesapeake representatives suggested in e-mails that Mr. Murphy mislead Mr. Hickman and his siblings and say that, because Chesapeake held leases on the properties all around the Ohio County tract, Chesapeake planned "to drill with or without" a lease on the tract. However, Chesapeake suggested Mr. Murphy emphasize that the property "could be an integral part of our unit."

Mr. Murphy approached Mr. Hickman and his three siblings in late 2010, and offered them a new oil and gas lease with Chesapeake.

On January 5, 2011, at the SpringHill Suites hotel in Wheeling, all four Hickman siblings (including the plaintiff, Mr. Hickman) met together with Mr. Murphy

9

to jointly sign the lease. The lease was between Chesapeake and the four siblings, for a five-year term. Only the four siblings signed the lease, on four lines with each sibling's name identifying them as the "Lessor." There are no other signature lines on the lease; hence, no representative for Chesapeake signed, nor did Mr. Murphy or anyone acting on behalf of Red Sky.

As consideration for the lease, Chesapeake offered Mr. Hickman and his siblings "consideration of Ten Dollars ($10.00)" and a "bonus paid by Lessee [Chesapeake] for the execution hereof[.]" Mr. Hickman and his siblings agree they received payment of the $10.00 in cash. However, rather than paying the up-front lease bonus immediately, Chesapeake gave Mr. Hickman and each of his siblings an "Order of Payment" for $179,710.00,[7] to be paid within 90 days. The Order of Payment contained additional conditions, namely one that conditioned payment of the bonus "upon title to the property interests leased being confirmed satisfactorily to Chesapeake, in its sole discretion." The Order of Payment also says that Chesapeake "retains the right to surrender the Lease . . . at any time and for any reason." Mr. Hickman signed the Order of Payment.

---

[7] Put another way, the four siblings were to receive a total of $718,840, or $10 short of $5,000 an acre.

10

Finally, the January 2011 lease has an arbitration provision providing that in the event of a dispute regarding the lease or the associated Order of Payment, "the resolution of all such disputes shall be determined by arbitration[.]"[8]

The parties agree that Chesapeake never paid Mr. Hickman the $179,710.00 bonus payment for Mr. Hickman's execution of the lease.

At some point in late January 2011, Mr. Murphy (as an agent for Red Sky and Chesapeake) contacted Mr. Hickman and his siblings. Mr. Murphy stated that Chesapeake had "discovered" Mr. Hickman's July 2006 lease, and "discovered" that the lease would not expire until July 2011. Chesapeake claims it did no title verification prior to signing the January 2011 leases, even though it owned the December 2005 and July 2006 leases through an assignment by Range Resources. The four siblings assert that Mr. Murphy told them Chesapeake would not pay any sibling the promised $179,710.00 due to each of them unless they agreed to amend the January 5, 2011, lease to remove Mr. Hickman as a party thereto. Additionally, Mr. Hickman says he was told

_____

[8] The arbitration clause in the January 2011 Chesapeake lease provides:

> In the event of a disagreement between Lessor and Lessee concerning this Lease or the associated Order of Payment, performance thereunder, or damages caused by Lessee's operations, the resolution of all such disputes shall be determined by arbitration in accordance with the rules of the American Arbitration Association. Arbitration shall be the exclusive remedy and cover all disputes, including but not limited to, the formation, execution, validity and performance of the Lease and Order of Payment. All fees and costs associated with the arbitration shall be borne equally by Lessor and Lessee.

11

Chesapeake could still drill the property because his siblings were under contract, and he would receive nothing (including royalties). Mr. Murphy denies making these representations.

### E. *Fourth Lease: February 2011*

Mr. Murphy, acting on behalf of Chesapeake and Red Sky, proposed that the plaintiff, Mr. Hickman, sign a new "top lease." Mr. Hickman asserts he suffered from significant duress as a result of statements made by Mr. Murphy. Mr. Hickman claims he believed he would cost his siblings their share of the bonus as well as royalties if he failed to execute the new top lease. Mr. Hickman testified he felt he had no choice but to acquiesce to the demands of Chesapeake, Red Sky, and Mr. Murphy.

Effective February 15, 2011, Mr. Hickman agreed to a new lease with Chesapeake for his ¼ share of the Ohio County tract.[9] The lease was for a five-year term, and contained the same arbitration provision as the January 2011 lease.[10] Only Mr. Hickman signed the lease. As with the January 2011 lease, no representative for Chesapeake signed the lease, nor was it signed by Mr. Murphy or any representative for Red Sky.

---

[9] To compound the confusion in this case, Mr. Hickman actually signed the lease on March 7, 2011. The lease form signed by Mr. Hickman was backdated by Chesapeake to February 15th.

[10] For the full text of the arbitration clause, see *supra* footnote 8.

The February 2011 lease states that the lease was signed in consideration of $10.00. However, Mr. Hickman asserts he received no new consideration for the new lease. Mr. Murphy, in his deposition, at first agreed that Mr. Hickman was not paid the $10.00 or given any other consideration, but later said he was not sure and "if it wasn't . . . I believe it would have been an oversight."[11]

Furthermore, the February 2011 lease eliminated any requirement that Chesapeake pay Mr. Hickman the $179,710.00 up-front bonus as consideration for executing the lease. Once Mr. Hickman signed the new lease, his three siblings were paid their up-front bonuses as set in the January 2011 lease.

---

[11] In his deposition, Mr. Murphy answered questions as follows:

Q. Was there any additional consideration for Cecil Hickman to sign a document removing himself from the January 5 lease?

A. No. . . .

Q. Was there any additional consideration paid to Cecil Hickman to sign a February 15 top lease? . . .

A. No.

Q. Okay. You know what the word "consideration" means, right?

A. Uh-huh. . . . Yes. . . .

Q. Do you know whether or not the $10 nominal consideration for the February 15th contract was ever paid to Mr. Hickman to validate it?

A. I'm not sure. If it wasn't, like I said before, I believe it would have been an oversight.

Finally, the record and the arguments of the parties suggest that sometime in late Spring of 2011 – certainly before July 2011 – Chesapeake made an effort to drill on the Ohio County tract. Plaintiff Hickman contends that Chesapeake just "moved some dirt around," while Chesapeake seems to suggest enough work was done to constitute "a bona fide attempt to secure . . . the production" of oil and gas, sufficient to lock Mr. Hickman into his July 2006 lease.

### F. *The Plaintiff's Lawsuit*

On January 5, 2012, plaintiff Hickman filed the instant case against the defendants, and the plaintiff's claims are intertwined among the four leases. First, Mr. Hickman sought a declaratory judgment that he was bound by the December 2005 Range Resources lease, and not by the July 2006 Range Resources lease. Although Mr. Hickman did not sign the December 2005 lease, he asserts that his "meeting of the minds" (and his siblings' agreement) with Range Resources was that all four siblings would be on the same lease, with the same start and end dates. Mr. Hickman also sought a judgment that the December 2005 lease had expired when Mr. Hickman and his siblings signed the January 2011 Chesapeake lease. Further, Mr. Hickman sought a declaratory judgment that either he was bound by the January 2011 lease with Chesapeake, or that there had been no 2011 lease of his oil and gas rights whatsoever.

Second, Mr. Hickman sought damages against defendants Mr. Capouillez and his company, Geological Assessment & Leasing. Mr. Hickman alleged that these defendants were negligent, incompetent, and had breached their fiduciary duty by failing

14

to ensure that all four siblings were encompassed by the December 2005 lease with defendant Range Resources.

Third, Mr. Hickman sought damages from defendant Range Resources. He asserted that Range Resources had fraudulently altered the July 2006 lease, essentially claiming that while the parties had orally agreed to an effective lease date in December 2005, an agent of Range Resources had shifted the effective date to July 2006. Additionally, Mr. Hickman alleged that, by altering the effective date, Range Resources had published statements derogatory to plaintiff's title to his land. Lastly, the plaintiff sought an order estopping Range Resources from asserting any effective date other than December 2005 for the lease of the property.

Fourth, Mr. Hickman sought damages from defendants Mr. Murphy and Red Sky. The plaintiff alleged he had been harmed by false representations from these defendants, and that those representations had fraudulently induced him to sign the February 2011 lease.

Finally, Mr. Hickman sought damages from Chesapeake. The plaintiff contended that Chesapeake had breached the implied covenant of good faith and fair dealing in its leases; that it had been negligent, reckless, or intentional in its handling of the leases; that it had published false statements derogatory to the plaintiff's title in the property; and that Chesapeake had engaged in the tort of outrage.

15

G. *The Circuit Court's Order: A Major League Effort*

All of the defendants filed motions asking the circuit court to dismiss the action, and asking the circuit court to compel the plaintiff to participate in arbitration. The circuit court initially denied the motions and compelled the parties to conduct discovery on the enforceability of the arbitration provisions in each of the four leases.

The defendants subsequently renewed their motions to dismiss and their motions to compel arbitration. The plaintiff replied that the January 2011 arbitration clause was unenforceable because it was unconscionable; he also asserted that the remaining three leases (and the arbitration clauses therein) were expired or void under general principles of state contract law. Because of the evidence attached to the motions, the circuit court treated the motions as asking for summary judgment.

In a lengthy order entered August 7, 2014, the circuit court partially ordered the parties to participate in arbitration, and partially granted the plaintiff substantive relief. The circuit court's order reflects a *major league* effort to make sense of the complex record and conflicting, overlapping arguments of the parties, and elucidates to this Court the basis for its ruling.[12] The circuit court's ruling basically distills down to

___

[12] On the one hand, in an ivory-tower sense, the complex facts in this case suggest that an arbitration conducted by specialists in the field of oil and gas law would be beneficial to the parties. On the other hand, the reality of this case demonstrates the problem with compelling unwilling, unsophisticated parties with minimal financial resources to participate in arbitration. The instant case involves four separate arbitration clauses and, if interpreted literally, would require the plaintiff to pay half of the costs for four separate arbitration proceedings involving 12 arbitrators. Those four proceedings could result in inconsistent, conflicting outcomes that might financially devastate an impecunious landowner. We appreciate the circuit court's efforts to reach an "eminently
(continued . . .)

16

this: the circuit court voided two of the four leases (July 2006 and February 2011); found a third lease had expired (December 2006); and compelled the plaintiff and all of the defendants to arbitrate under the January 2011 Chesapeake lease. However, to avoid failure of the January 2011 lease for lack of consideration and before arbitration may occur, the circuit court ruled that Chesapeake must pay Mr. Hickman the up-front bonus promised for execution of the January 2011 lease, as well as any royalties due after execution of the lease.

First, the circuit court voided the second Range Resources lease of July 2006, as well as its arbitration clause. The circuit court determined there was no meeting of the minds between Range Resources and Mr. Hickman for this lease. The circuit court then ruled – despite an arbitration clause saying that disputes about the interpretation of the lease should be referred to arbitration – that the first lease of December 2005 was the controlling lease between Range Resources and Mr. Hickman (even though Mr. Hickman never signed the December 2005 lease). Lastly, the circuit court concluded that the December 2005 lease expired in December 2010, and was of no force or effect.

Second, the circuit court voided the February 2011 lease between Chesapeake and Mr. Hickman. The circuit court found that the February 2011 lease had been procured by mistakes of fact and misrepresentations made by Mr. Murphy, Red Sky,

reasonable, logical and just" decision, even though some parts of the order, left to stand, are "contrary to the United States Supreme Court's interpretations of the Federal Arbitration Act." *State ex rel. Johnson Controls, Inc. v. Tucker*, 229 W.Va. 486, 497, 729 S.E.2d 808, 819 (2012).

17

and Chesapeake. The circuit court did not separately address the arbitration clause within the February 2011 lease, but in effect the order voided and refused to enforce the clause.

Third, the circuit court found that the arbitration clause in the January 2011 lease was both valid and enforceable, and was not unconscionable. The circuit court determined that Mr. Hickman and defendants Chesapeake, Mr. Murphy, and Red Sky were required to participate in arbitration under the terms of the January 2011 lease. However, the circuit court concluded that Mr. Capouillez and Range Resources were also required to participate in arbitration under the January 2011 lease (even though they were neither signatories to nor beneficiaries of the January 2011 lease).[13]

Finally, the circuit court addressed Chesapeake's failure to make the $179,710.00 up-front bonus payment to Mr. Hickman for the execution of the lease. The circuit court ordered Chesapeake to pay the bonus and any royalties due under the January 2011 lease, plus interest.

The defendants filed three separate appeals of the circuit court's August 7, 2014, summary judgment order. We consolidated the appeals for joint argument and consideration.

_____

[13] The circuit court stated:

> All parties herein, including non-signatory Defendants [to the January 2011 lease], shall participate in the arbitration proceeding based upon common law principles of contract and agency. . . . Given the relationship of the parties herein and the intertwined nature of the claims, all remaining claims involving all parties herein shall be arbitrated.

18

## II.
## STANDARD OF REVIEW

The defendants below all filed motions to dismiss the plaintiff's complaint under Rule 12(b) of the West Virginia Rules of Civil Procedure. However, discovery was conducted on those motions and evidence outside the pleadings was presented to the circuit court. It is axiomatic that, "Only matters contained in the pleading can be considered on a motion to dismiss under Rule 12(b) R.C.P., and if matters outside the pleading are presented to the court and are not excluded by it, the motion should be treated as one for summary judgment and disposed of under Rule 56 R.C.P. if there is no genuine issue as to any material fact in connection therewith." Syllabus Point 4, in part, *U.S. Fid. and Guar. Co. v. Eades*, 150 W.Va. 238, 144 S.E.2d 703 (1965).[14] The circuit court properly treated the defendants' motions as being for summary judgment.

We review a circuit court's summary judgment order *de novo*. Syllabus Point 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the

_____

[14] To be clear, "A circuit court ruling on a motion to dismiss under Rule 12(b)(6) of the West Virginia Rules of Civil Procedure may properly consider exhibits attached to the complaint without converting the motion to a Rule 56 motion for summary judgment." Syllabus Point 1, *Forshey v. Jackson*, 222 W.Va. 743, 671 S.E.2d 748 (2008). On a motion to dismiss, a court may consider, "in addition to the pleadings, documents annexed to it, and other materials fairly incorporated within it. This sometimes includes documents referred to in the complaint but not annexed to it." Franklin D. Cleckley, Robin Jean Davis & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure* § 12(b)(6) at 387 (4th Ed. 2012).

19

application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

**III.**
**ANALYSIS**

The defendants' three appeals center on the circuit court's attempt to parse and apply the arbitration clauses in the four leases. Defendant Mr. Capouillez and his company, Geological Assessment & Leasing, appeal asserting they are entitled to arbitrate their claims under the terms of Range Resources's December 2005 and July 2006 leases that Mr. Capouillez signed as "consultant," and not under the terms of the Chesapeake January 2011 lease which they did not negotiate or sign. Second and similarly, defendant Range Resources argues that it never participated in or signed the January 2011 Chesapeake lease, and therefore cannot be compelled to arbitrate under that lease.

Finally, defendant Chesapeake (along with its agents, defendants Mr. Murphy and Red Sky) claims on appeal that under the Federal Arbitration Act, a trial judge must "sever" an arbitration clause from the remainder of a contract to decide if it is enforceable or not.[15] If the arbitration agreement is enforceable, any other questions

---

[15] Chesapeake authored two of the arbitration clauses at issue (January 2011 and February 2011), and is party to the other two arbitration clauses (December 2005 and July 2006) by virtue of an assignment of rights by Range Resources. Further, the plaintiff's complaint sought relief that potentially implicated all four arbitration clauses. Yet, at oral argument, counsel for Chesapeake insisted that, because Chesapeake only cited the January 2011 arbitration clause in its motion to compel arbitration, the circuit court was prohibited from ruling on the merits of the other three clauses. We reject this

(continued . . .)

20

about the contract's validity must be determined by an arbitrator.  *See* Syllabus Point 4, *State ex rel. Richmond American Homes of West Virginia, Inc. v. Sanders*, 228 W.Va. 125, 717 S.E.2d 909 (2011).  Chesapeake argues that the circuit court was correct in finding the January 2011 arbitration agreement was enforceable.  However, Chesapeake claims the circuit court erred because it failed to refer all questions about the interpretation and validity of the other three leases to arbitration, going so far as to declare the July 2006 and February 2011 leases to be void.  Chesapeake claims the circuit court further erred when it interpreted the substance of the January 2011 lease to require Chesapeake to pay the plaintiff the up-front bonus and royalties allegedly due.

Before we consider the arguments of the defendants, we first set forth the guidelines for interpreting arbitration contracts.  To be clear, the leases at issue are to be construed like any other contract.[16]  "An oil and gas lease (or other mineral lease) is both a conveyance and a contract.  It is designed to accomplish the main purpose of the owner of the land and of the lessee (or its assignee) as operator of the oil and gas interests: securing production of oil or gas or both in paying quantities, quickly and for as long as production in paying quantities is obtainable."  Syllabus Point 1, *McCullough Oil, Inc. v. Rezek*, 176 W.Va. 638, 346 S.E.2d 788 (1986).  *See also*, *Teller v. McCoy*, 162 W.Va.

---

assertion, in large part because the remaining defendants do seek protection under the other arbitration clauses.

[16] *See* Phillip T. Glyptis, "Viability of Arbitration Clauses in West Virginia Oil and Gas Leases: It Is All About the Lease!!!," 115 W.Va.L.Rev. 1005, 1007 (2013) ("[A] lease is by definition a contract.  All rights and protections are controlled by the principles of contract law and depend on the proper construction.").

21

367, 383, 253 S.E.2d 114, 124 (1978) ("The authorities agree today that the modern lease is both a conveyance and a contract.").

The parties do not dispute that the four leases at issue evidence a transaction that affects interstate commerce, and so our analysis of the arbitration clauses within those leases is guided by the Federal Arbitration Act, 9 U.S.C. § 2 ("the FAA").

The primary substantive provision of the FAA is Section 2, which we have interpreted as follows:

> Under the Federal Arbitration Act, 9 U.S.C. § 2, a written provision to settle by arbitration a controversy arising out of a contract that evidences a transaction affecting interstate commerce is valid, irrevocable, and enforceable, unless the provision is found to be invalid, revocable or unenforceable *upon a ground that exists at law or in equity for the revocation of any contract.*

Syllabus Point 6, *Brown v. Genesis Healthcare Corp.,* 228 W.Va. 646, 724 S.E.2d 250 (2011) ("*Brown I* ") (emphasis added).

Section 2 of the FAA recognizes that an agreement to arbitrate is a contract. The rights and liabilities of the parties are controlled by the state law of contracts. If the parties have entered into a contract (which is valid under state law) to arbitrate a dispute, then the FAA requires courts to honor parties' expectations and compel arbitration. Conversely, a party cannot be forced to submit to arbitration any dispute which he or she has not agreed to submit. A court may submit to arbitration "those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (1995). *See also Richmond Am. Homes,* 228 W.Va. at 129, 717 S.E.2d at 913 (same).

22

More importantly, the FAA permits a court to refuse enforcement of an arbitration agreement to the extent "such grounds . . . exist at law or in equity for the revocation of any contract." *Richmond Am. Homes*, 228 W.Va. at 134, 717 S.E.2d at 918 (quoting 9 U.S.C. § 2). Nothing in the FAA "overrides normal rules of contract interpretation. Generally applicable contract defenses—such as laches, estoppel, waiver, fraud, duress, or unconscionability—may be applied to invalidate an arbitration agreement." Syllabus Point 9, *Brown I*, 228 W.Va. at 657, 724 S.E.2d at 261. "To be clear, this list is not exclusive. Misrepresentation, duress, mutuality of assent, undue influence, or lack of capacity, if the contract defense exists under general common law principles, then it may be asserted to counter the claim that a . . . provision binds the parties. Even lack of consideration is a defense." *Schumacher Homes of Circleville, Inc. v. Spencer*, 235 W. Va. 335, 346 n. 10, 774 S.E.2d 1, 12 n. 10 (2015).

When a lawsuit is filed implicating an arbitration agreement, and a party to the agreement seeks to compel arbitration, the United States Supreme Court has interpreted the FAA to require application of the doctrine of "severability" or "separability." Under the severability doctrine, arbitration clauses must be severed from the remainder of a contract, and must be tested separately under state contract law for validity and enforceability. In Syllabus Point 4 of *Richmond American Homes*, 228 W.Va. at 129, 717 S.E.2d at 913, we adopted the severance doctrine and said, in part:

> Under the Federal Arbitration Act, 9 U.S.C. § 2, and the doctrine of severability, only if a party to a contract explicitly challenges the enforceability of an arbitration clause within the contract, as opposed to generally

23

challenging the contract as a whole, is a trial court permitted to consider the challenge to the arbitration clause.

The doctrine of severability "'is essentially a pleading standard' that holds that 'only if a party explicitly challenges the enforceability of an arbitration clause within a contract is a court then permitted to consider challenges to the arbitration clause.'" *Richmond American Homes,* 228 W.Va. at 134, 717 S.E.2d at 918.

> The doctrine of severability means this: If a party challenges the enforceability of the entire contract (including the arbitration clause)—that is, the party does not sever the arbitration clause from the rest of the contract and make a discrete challenge to the validity of the arbitration clause— then the court is completely deprived of authority and only an arbitrator can assess the validity of the contract, including the validity of the arbitration clause.

*Brown I,* 228 W.Va. at 675, 724 S.E.2d at 279 (quotations and footnotes omitted).

Under the severance doctrine, the FAA requires a severed arbitration clause to be evaluated under precepts of state contract law applicable to any contract (not just arbitration agreements). Hence, we also concluded in Syllabus Point 4 of *Richmond American Homes* that, when scrutinizing an arbitration clause:

> [T]he trial court may rely on general principles of state contract law in determining the enforceability of the arbitration clause. If necessary, the trial court may consider the context of the arbitration clause within the four corners of the contract, or consider any extrinsic evidence detailing the formation and use of the contract.

228 W.Va. at 129, 717 S.E.2d at 913. In other words, "State contract law requires a trial court examining the enforceability of a contract provision to weigh the challenged provision in context, and consider other parts of the contract that relate to, support, or are

24

otherwise intertwined with the operation of the challenged provision." *Schumacher Homes of Circleville, Inc.*, 235 W.Va. at 345, 774 S.E.2d at 11.

In the instant case, the arbitration-clause-containing contracts at issue are leases. The general state law rule for leases is the same as for contracts: terms of the lease are not to be construed in a vacuum, but are to be read in their context. "As with other contracts, the language of a lease agreement must be considered and construed as a whole, giving effect, if possible, to all parts of the instrument. Accordingly, specific words or clauses of an agreement are not to be treated as meaningless, or to be discarded, if any reasonable meaning can be given them consistent with the whole contract." Syllabus Point 3, *Moore v. Johnson Serv. Co.*, 158 W.Va. 808, 219 S.E.2d 315 (1975). *See also*, Syllabus Point 3, *United Fuel Gas Co. v. Cabot*, 96 W.Va. 387, 122 S.E. 922 (1924) ("[A]ll elements of description and all parts of the lease must be considered and weighed to arrive at the intention of the instrument."); Syllabus Point 2, *Marmet v. Watson*, 106 W.Va. 429, 145 S.E. 744 (1928) ("In a coal mining lease, all of its provisions must be considered in arriving at the intention of the parties . . . and the situation of the parties, the surrounding circumstances, and what the parties have done under the contract may be also considered in determining the intention.").

Once the arbitration clause has been severed out for scrutiny, the FAA limits the trial court to considering only two threshold questions: (1) Under general principles of state contract law, is there a valid, irrevocable, and enforceable arbitration agreement between the parties? And, (2) Does the parties' dispute fall within the scope of the arbitration agreement? Syllabus Point 2, *State ex rel. TD Ameritrade, Inc. v.*

25

*Kaufman,* 225 W.Va. 250, 692 S.E.2d 293 (2010). This second question must be weighed in view of the FAA being a "congressional declaration of a liberal federal policy favoring arbitration agreements," and establishing that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Memorial Hosp. v. Mercury Const. Corp.,* 460 U.S. 1, 24 (1983).

We now examine the four lease agreements disputed by the parties, and – as required by the severance doctrine – focus primarily upon the arbitration clauses. For purposes of clarity, we will examine the leases in reverse order, from newest to oldest.

A. *The February 2011 Lease is Void*

We begin with the fourth lease, signed by plaintiff Mr. Hickman in February 2011. The circuit court ruled that the entire February 2011 lease "was procured due to a mistake in fact and misrepresentation on the part of [defendants] Chesapeake, Red Sky and Murphy, and is therefore void and unenforceable as a matter of law." We affirm the circuit court's ruling.

The plaintiff, in his complaint, specifically alleged that his signature on the February 15, 2011, lease had been procured by false representations from Chesapeake and its agents, Red Sky and Mr. Murphy, or by a mutual mistake of fact. When Chesapeake sought arbitration of the question (while citing the January 2011 arbitration clause, rather than the February 2011 clause), the plaintiff properly severed and challenged the enforceability of the arbitration clause.

26

The plaintiff asserts he was induced to sign the February 2011 lease by fraudulent conduct. "Fraud in the procurement of a deed or contract always renders it voidable." Syllabus Point 1, *Jones v. Comer*, 123 W.Va. 129, 13 S.E.2d 578 (1941). *See also North v. W.Va. Bd. of Regents*, 175 W.Va. 179, 183, 332 S.E.2d 141, 145 (1985) ("[I]t is settled doctrine that fraud in the procurement of an agreement or the obtaining of some benefit vitiates any right to receive the fruits of the contract or the benefits."); Syllabus Point 2, *Engeman v. Taylor*, 46 W.Va. 669, 33 S.E. 922 (1899) ("Any contract, the making of which is induced by fraud of either party practiced upon the other at the time the contract is made, or while negotiations in regard to it are being carried on, is voidable, and may be rescinded at the election of the party defrauded."). "A party that is misled as to the essential terms of a contract does not technically agree to the contract, as no assent to its terms has been formulated due to the misrepresentation." *Herrod v. First Republic Mortgage Corp.*, 218 W.Va. 611, 625-26, 625 S.E.2d 373, 387-88 (2005).

The plaintiff also asserts he signed the February 2011 lease while laboring under a mistake of fact. "As a general rule, one who enters into a contract or performs some act while laboring under a mistake of material fact is entitled to have the transaction or the act set aside in a court of equity[.]" Syllabus Point 1, in part, *Webb v. Webb*, 171 W.Va. 614, 301 S.E.2d 570 (1983). "A mistake of fact consists of an unconscious ignorance or forgetfulness of a material fact, past or present, or of a mistaken belief in the past or present existence of a material fact which did not or does not actually exist." Syllabus Point 2, in part, *Id. See also*, *Brannon v. Riffle*, 197 W.Va. 97, 101, 475 S.E.2d 97, 101 (1996) ("Accordingly, if the parties were suffering under a mutual mistake

27

regarding the validity of the . . . lease at the time they entered into the . . . agreements and consequently, the resulting 'written instrument . . . does not embody the "bargained-for" agreement of the parties[,]' the law treats what would otherwise be viewed as a mistake of law as a mistake of fact.").

As a procedural aside, we note that the circuit court failed to sever the arbitration clause from the remainder of the February 2011 lease. The circuit court merely found the entire lease to be invalid. While this is technically improper under the FAA, we do not find this problematic,[17] for an obvious reason: Chesapeake never asserted it was entitled to arbitration under the February 2011 arbitration clause. Chesapeake failed to raise the arbitration clause even after the plaintiff challenged the validity of the entire February 2011 lease. Instead, Chesapeake asserted it was entitled to

---

[17] We recently considered the confounding nature of such technical improprieties in a footnote to *Schumacher Homes of Circleville, Inc.*, 235 W.Va. at 342 n. 6, 774 S.E.2d at 8 n. 6, where we discussed *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967). In *Prima Paint*, the plaintiff and defendant entered into a consulting agreement that contained an arbitration clause. The plaintiff later sued the defendant, claiming the entire agreement was procured by fraud. The Supreme Court ruled that, under the FAA, the arbitration clause was presumed valid and enforceable unless the plaintiff proved that, separately from the rest of the consulting agreement, the clause had also been procured by fraud. Because the plaintiff did not sever the arbitration clause from the overall contract and challenge it exclusively, the Supreme Court ordered that the case be sent to arbitration. *Id.*, 388 U.S. at 401-404.

The three dissenting justices in *Prima Paint* summarized the majority's interpretation of the FAA as creating a procedure that "compels a party to a contract containing a written arbitration provision to carry out his 'arbitration agreement' even though a court might, after a fair trial, hold the entire contract—including the arbitration agreement—void because of fraud in the inducement." 388 U.S. at 407 (Black, J., dissenting). They therefore labeled the *Prima Paint* decision "fantastic" because "Congress did not impose any such procedures in the Arbitration Act." *Id.*

28

relief under the January 2011 lease and arbitration clause, which the plaintiff properly severed and challenged. We have long held that "[t]his Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment." Syllabus Point 3, *Barnett v. Wolfolk*, 149 W.Va. 246, 140 S.E.2d 466 (1965). By our measure, Chesapeake has waived enforcement of the February 2011 arbitration clause.

The record supports the circuit court's finding that Mr. Murphy, on behalf of Red Sky and Chesapeake, made material and misleading statements to Mr. Hickman regarding the rights and responsibilities of the parties under (second) July 2006 lease, the (third) January 2011 lease, and the need for the (fourth) February 2011 lease. The arbitration clause in the February 2011 lease was, along with the other terms of the lease, procured through misleading statements. The record supports the circuit court's determination that Chesapeake refused to pay Mr. Hickman's siblings their bonus payments or future royalty payments due under the January 2011 lease until Mr. Hickman signed the new lease. The record therefore supports the circuit court's conclusion that Mr. Hickman conceded to the new arbitration clause, as well as the remainder of the February 2011 lease, under significant duress.

Additionally, Chesapeake repeatedly characterizes the February 2011 lease as a "top lease." Properly defined, a top lease is "a lease granted by a landowner, during the existence of a recorded mineral lease, which is to become effective if and when the existing lease expires or is terminated." J. Zak Ritchie, "A Fresh Look at an Old Tort:

29

Litigating Slander of Title in Mineral Disputes," 115 W.Va. L. Rev. 1097, 1118 (2013). *See also*, Patrick H. Martin and Bruce M. Kramer, 8 *Williams & Meyers Oil and Gas Law* 1083 (2014) (A top lease is "[a] lease granted by a landowner during the existence of a recorded mineral lease which is to become effective if and when the existing lease expires or is terminated.").

Chesapeake claims that the February 2011 lease was nothing more than a top lease to the July 2006 lease signed by Mr. Hickman, and which was still in effect. Chesapeake (along with Mr. Murphy and Red Sky) suggests that the February 2011 lease was merely a product of their diligent efforts in determining (after the January 2011 lease was signed) that Mr. Hickman's title to the tract was not confirmed to their satisfaction.

The circuit court, however, properly discerned from the record that Chesapeake owned the December 2005 and July 2006 Range Resources leases by assignment, and knew or should have known that Mr. Hickman and his siblings were jointly leasing the tract. Both Mr. Hickman and Chesapeake operated on the assumption that Mr. Hickman and his siblings were bound by the December 2005 lease which expired by the time the January 2011 lease was signed.

Further, the December 2005 memorandum of lease (recorded in June 2006) was a public notice that Mr. Hickman and his siblings leased the tract to Range Resources for five years, effective December 21, 2005. Even Mr. Murphy testified that Chesapeake knew or should have known that Mr. Hickman was a party to the December 2005 lease, based upon the memorandum of lease. Only later did Chesapeake investigate its own records and decide that there was a cloud on Mr. Hickman's title to the tract. To the

extent the parties were suffering under a mutual mistake regarding the validity of the December 2005 and July 2006 leases at the time they entered into the February 2011 lease, the resulting "written instrument . . . does not embody the 'bargained-for' agreement of the parties," and so the law treats the misunderstanding as a mistake of fact. *Brannon v. Riffle*, 197 W.Va. 97, 101, 475 S.E.2d 97, 101 (1996) (quoting *Webb*, 171 W.Va. at 619 n.5, 301 S.E.2d at 575 n.5).

Additionally, the circuit court made a specific finding of fact that no consideration was paid to Mr. Hickman at the time he executed the February 2011 lease. "The elements of a contract are an offer and an acceptance supported by consideration." *Dan Ryan Builders, Inc. v. Nelson*, 230 W.Va. 281, 287, 737 S.E.2d 550, 556 (2012). "That consideration is an essential element of, and is necessary to the enforceability or validity of a contract is so well established that citation of authority therefor is unnecessary." *First Nat. Bank of Gallipolis v. Marietta Mfg. Co.*, 151 W.Va. 636, 642, 153 S.E.2d 172, 177 (1967). *See also*, *Cook v. Heck's Inc.*, 176 W.Va. 368, 373, 342 S.E.2d 453, 458–459 (1986) ("Consideration is also an essential element of a contract."); Syllabus Point 1, *Thomas v. Mott*, 74 W.Va. 493, 82 S.E. 325 (1914) ("No promise is good in law unless there is a legal consideration in return for it."); *Sturm v. Parish*, 1 W.Va. 125, 144 (1865) ("That a parol contract or promise without consideration is void, is too well established to require any comment.").

Consideration is an essential element of a valid contract, and it is axiomatic that past consideration already given for a previous agreement cannot constitute valid consideration for a new agreement. Syllabus Point 1, *Cole v. George*, 86 W.Va. 346, 103

31

S.E. 201 (1920) ("An agreement by one to do what he is already legally bound to do is not a good consideration for a promise made to him."). Put succinctly, a "promise or contract where there is no valuable consideration, and where there is no benefit moving to the promisor or damage or injury to the promisee, is void." Syllabus Point 2, *Sturm*, 1 W.Va. at 125.

In summary, we find that the circuit court properly applied the state law of contracts pertaining to fraud, misrepresentation, and mistake of fact to the arbitration clause within the February 2011 lease and effectively found the clause to be unenforceable. The circuit court was therefore within its authority to go forward, address the merits of the plaintiff's contentions, grant summary judgment and rule that the entire February 2011 lease was unenforceable. On this point, the circuit court's order is affirmed.

### B. *The January 2011 Lease*

We next examine the third lease of January 2011. This lease is the point around which all other disputes in this case orbit. As previously noted, the circuit court found the arbitration clause in the January 2011 lease to be conscionable, valid and enforceable.[18] Problematically, the circuit court ordered all of the parties – including non-signatories – to participate in arbitration under the clause. Finally, the circuit court

---

[18] Before the circuit court, Mr. Hickman argued that the January 2011 lease was unconscionable. He has not pursued that argument on appeal.

ordered Chesapeake to pay the plaintiff the up-front bonus "for the execution" of the lease, plus royalties and interest. The defendants make two separate challenges to the circuit court's rulings regarding the January 2011 lease.

(1) *Non-Signatories to the Arbitration Agreement*

First, defendants Mr. Capouillez, Geological Assessment & Leasing, and Range Resources were only signatories to the December 2005 and July 2006 leases. They essentially argue that they can only be compelled to arbitrate under those two leases. As Range Resources asserts, they played no role in the negotiation, procurement or signing of the January 2011 lease, and were not parties to the January 2011 lease, and therefore the circuit court erred in compelling them to arbitrate under the terms of that lease. We agree and reverse the circuit court's order on this point.

It is a fundamental tenet of contract law that the parties must enter into a meeting of the minds in order to form an enforceable contract. "A meeting of the minds of the parties is a *sine qua non* of all contracts." Syllabus Point 1, *Martin v. Ewing*, 112 W.Va. 332, 164 S.E. 859 (1932). A party generally cannot be forced to participate in an arbitration proceeding unless the party has, in some way, agreed to participate. Hence, as a general rule, "A court may not direct a nonsignatory to an agreement containing an arbitration clause to participate in an arbitration proceeding absent evidence that would justify consideration of whether the nonsignatory exception to the rule requiring express assent to arbitration should be invoked." Syllabus Point 3, *State ex rel. United Asphalt Suppliers, Inc. v. Sanders*, 204 W.Va. 23, 511 S.E.2d 134 (1998). *See also*, *E.I. DuPont*

33

*de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.*, 269 F.3d 187, 194 (3d Cir. 2001) ("[A] non-signatory cannot be bound to arbitrate unless it is bound under traditional principles of contract and agency law to be akin to a signatory of the underlying agreement.").

The U.S. Court of Appeals for the Second Circuit has posited that there are five different theories, all arising out of common law principles of contract and agency law, under which a signatory to an arbitration agreement may bind a non-signatory. Those five theories are: "(1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel." *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir. 1999) (quoting *Thomson–CSF v. American Arbitration Association*, 64 F.3d 773, 776 (2d Cir. 1995)). Other courts have adopted this formulation.[19]

---

[19] *See, e.g., Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005) ("There are five theories for binding nonsignatories to arbitration agreements: (1) incorporation by reference, (2) assumption, (3) agency, (4) veil-piercing/alter ego, and (5) estoppel."); *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 629 (6th Cir. 2003) (citing *Thomson-CSF*); *Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH*, 206 F.3d 411, 417 (4th Cir. 2000) (citing *Thomson-CSF*). *But see Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 345 F.3d 347, 356 (5th Cir. 2003) ("Six theories for binding a nonsignatory to an arbitration agreement have been recognized: (a) incorporation by reference; (b) assumption; (c) agency; (d) veil-piercing/alter ego; (e) estoppel; and (f) third-party beneficiary."); *Ellsworth v. Am. Arbitration Ass'n*, 148 P.3d 983, 989 n. 11 (Utah 2006) ("Traditionally, five theories for binding a nonsignatory to an arbitration agreement have been recognized: (1) incorporation by references; (2) assumption; (3) agency; (4) veil-piercing/alter-ego; and (5) estoppel. . . . Sometimes a sixth theory, third-party beneficiary, is added, but it is closely analogous to the estoppel theory.").

Application of any of these five theories depends upon whether the party resisting arbitration is a signatory or not. *See Thomson–CSF*, 64 F.3d at 779. "[A] court should be wary of imposing a contractual obligation to arbitrate on a non-contracting party." *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 97 (2d Cir.1999).

> Thus a willing non-signatory seeking to arbitrate with a signatory that is unwilling may do so under what has been called an alternative estoppel theory, which takes into consideration the relationships of persons, wrongs and issues. But a willing signatory . . . seeking to arbitrate with a non-signatory that is unwilling . . . must establish at least one of the five theories described in *Thomson–CSF*, 64 F.3d at 776– 80.

*Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003) (citations omitted).

We therefore hold that a signatory to an arbitration agreement cannot require a non-signatory to arbitrate unless the non-signatory is bound under some traditional theory of contract and agency law. The five traditional theories under which a signatory to an arbitration agreement may bind a non-signatory are: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel.

In the instant case, no one disputes that Mr. Capouillez, Geological Assessment & Leasing, and Range Resources are non-signatories to the January 2011 lease. Furthermore, we see nothing in the record to suggest that these three non-signatory defendants asked to arbitrate under the January 2011 arbitration clause, and nothing suggesting any other party sought to compel their participation in arbitration pursuant to

35

the January 2011 lease. We also see nothing, in either the record or the circuit court's order, to establish why these non-signatories should be bound to arbitrate under the five traditional theories set forth above.

Accordingly, the circuit court erred in compelling defendants Mr. Capouillez, Geological Assessment & Leasing, and Range Resources to participate in arbitration under the terms of the January 2011 lease, and the circuit court's order is reversed on this point.

(2) *Chesapeake's Up-Front Bonus and Royalties*

Second, we turn to Chesapeake's arguments concerning the January 2011 lease. Chesapeake asserts that the circuit court properly found the January 2011 lease contained a valid arbitration agreement, but erred when it then went on to make findings of fact and conclusions of law that addressed the substance of some of Mr. Hickman's claims.

Chesapeake contends that the circuit court's ruling violated the severance doctrine. As we noted previously, under the FAA a trial court must carve out an arbitration clause for sole consideration, and "is limited to determining the threshold issues of (1) whether a valid arbitration agreement exists between the parties; and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement." Syllabus Point 2, *TD Ameritrade, Inc.*, 225 W.Va. at 251, 692 S.E.2d at 294. Once the circuit court found the January 2011 arbitration clause was valid, conscionable and enforceable, Chesapeake argues that the circuit court was prohibited

from addressing the issue of the up-front bonus and royalties that Chesapeake refused to pay to Mr. Hickman. Chesapeake asserts the substance of the up-front bonus issue and later-earned royalties should have been referred to the arbitrator for consideration.

Plaintiff Hickman responds that the circuit court's order was correct, and that the order does comply with Syllabus Point 2 of *TD Ameritrade*. While the circuit court rejected Mr. Hickman's discrete challenge that the January 2011 arbitration clause was unconscionable (and therefore found it to be a "valid arbitration agreement"), Mr. Hickman argues that the circuit court determined that the up-front bonus was consideration for the execution of the lease agreement. In order for the arbitration clause and the lease to be enforceable, Chesapeake had to pay Mr. Hickman the up-front bonus that it promised to pay "for the execution" of the lease. In essence, Mr. Hickman argues that if Chesapeake fails to pay the up-front bonus, there is no enforceable lease and no enforceable arbitration clause.

We perceive two parts to Chesapeake's arguments: issues regarding the up-front bonus for the execution of the lease; and issues about the royalties to be paid after the lease was executed. We address them separately.

The confusion on the question of the up-front bonus derives from the conflict inherent within Chesapeake's arguments. On the one hand, Chesapeake asserts that the January 2011 lease, as a whole, is valid and enforceable, and that the arbitration clause within the lease is likewise valid and enforceable. On the other hand, Chesapeake simultaneously asserts that the January 2011 lease is invalid as to Mr. Hickman; that it was "surrendered" by Chesapeake; and that it was amended and/or replaced by the

37

February 2011 lease executed by Mr. Hickman (which the circuit court correctly found was invalidly procured through fraud and mistake). Chesapeake argues that its compliance with the January 2011 Order of Payment for the up-front bonus was purely discretionary and basically made the lease an option. As the Order of Payment provided, payment was "conditioned upon title to the property interests leased being confirmed satisfactorily to Chesapeake, in its sole discretion." Chesapeake says when it decided Mr. Hickman's property interests were unsatisfactory, it exercised its "right to surrender the Lease associated with the Order of Payment at any time and for any reason."

As this case typifies, oil and gas leases utilize terms that are unique to leases of their genre. Many leases require payment of "delay rentals," which "represent sums paid by the lessee to the lessor on an annual, quarterly or other basis for the privilege of postponing drilling or other operations under the lease[.]" *Davis v. Hardman*, 148 W.Va. 82, 89, 133 S.E.2d 77, 81 (1963). *See also Robinson v. Milam*, 125 W.Va. 218, 224, 24 S.E.2d 236, 239-40 (1942) (delay rental is "that money to be paid by a lessee in lieu of further development . . . the money so paid being a consideration for forbearance to enforce a covenant for reasonable development").

The January 2011 Chesapeake lease is identified as a "Paid-Up Oil & Gas Lease," "meaning that the delay rental payments for the entire primary term of the lease are paid in advance with the bonus consideration." *Burlew v. Talisman Energy USA Inc.*, 35 Misc.3d 799, 804, 940 N.Y.S.2d 781, 786 (Sup. Ct. 2011). The lease provides, in bold text, "The parties hereto agree that this is a Paid-Up Lease with no further Delay Rental and/or Delay in Marketing payments due to Lessor during the primary term hereof."

38

Hence, rather than pay periodic delay payments after execution of the lease but before starting production, Chesapeake offered Mr. Hickman and his siblings an up-front bonus. "A 'bonus' ordinarily signifies a lump sum paid by the lessee to the lessor as a consideration for the execution of the lease." *Davis*, 148 W.Va. at 89-90, 133 S.E.2d at 81. A bonus is not paid for the right to delay production; it is "the cash consideration paid or agreed to be paid for the execution of the lease." *Griffith v. Taylor*, 156 Tex. 1, 6, 291 S.W.2d 673, 676 (1956). "'Bonus' is defined as '[A] payment that is made in addition to royalties and rent as an incentive for a lessor to sign an oil-and-gas lease.'" *In re Estate of Slaughter*, 305 S.W.3d 804, 811 (Tex. App. 2010) (quoting *Black's Law Dictionary* 206 (9th ed. 2009)). "Provision of a bonus consideration provides 'both a speculative and a certain inducement' [to a landowner] to enter into the paid up lease, insofar as there is a chance to collect more by way of royalty payments, but at the least, the lessors are entitled to the bonus consideration." *Burlew*, 35 Misc.3d at 805, 940 N.Y.S.2d at 786-87.[20]

In recent years, however, up-front bonuses have suggested a darker side to the oil and gas leasing industry, as some mineral producers treated their promise to pay a bonus as merely an option. As one commentator noted,

> Despite the fact that the bonus induces the lessor to execute a
> lease and the lessee is generally under no obligation to

---

[20] Federal courts also make distinctions between bonuses and delay rentals in the context of taxation, because the two types of payments are treated differently for tax purposes. *See*, *e.g.*, *White Castle Lumber & Shingle Co. v. United States*, 481 F.2d 1274 (5th Cir. 1973); *Bennett v. Scofield*, 170 F.2d 887 (5th Cir. 1948).

develop the property so as to provide royalties, some lessees have unfortunately offered bonuses with little or no intention of tendering such payments, unless it is financially prudent to do so.

Due to the oil industry's speculative nature, some lessees refuse to tender a lease's bonus if market fluctuations or exploratory drilling render the lessor's property worthless.

Zachary R. Eiken, "The Dark Side of the Bakken Boom: Protecting the Importance of an Oil and Gas Lease's Bonus Payment Through A Proposed Legislative Amelioration of *Irish Oil and Gas, Incorporated v. Riemer*," 89 N.D. L. Rev. 679, 684 (2013). Several cases have arisen in West Virginia and western Pennsylvania where oil and gas producers induced landowners to sign leases through the use of illusory bonuses backed by an Order of Payment (or a similar sight draft),[21] only to later renege and refuse to pay the promised bonus.[22]

---

[21] "[A] sight draft is an order to pay a specified amount by a specified date. But unlike a check, a sight draft usually contains certain contingencies that must occur before the bank is authorized to release the funds, such as approval of the lease and/or verification of title. As a result, oil and gas companies often use sight drafts as a virtual 'escrow agent,' allowing the company to take immediate possession of the signed lease while delaying payment so that the company may verify the lessor's title." Jesse R. Pierce, "The Use and Perils of Sight Drafts in Leasing Transactions," 59 Rocky Mt. Min. L. Inst. 28-2 (2013).

[22] *See*, *e.g.*, *Backwater Properties, LLC. v. Range Resources-Appalachia, LLC*, No. 1:10CV103, 2011 WL 1706521 (N.D.W. Va. May 5, 2011) (permitting class action to proceed for fraud after oil and gas lessee offered landowners bonus, payable in 180 days, in return for signing a lease; when oil and gas prices thereafter plummeted, lessee returned leases to landowners stamped "void"); *Shafer v. Range Resources-Appalachia, LLC*, No. 2:10-CV-1142, 2011 WL 677479 (W.D. Pa. Feb. 16, 2011) (refusing to dismiss landowner's claim for breach of contract when oil and gas lessee refused to pay bonus); *Valentino v. Range Resources-Appalachia, LLC*, No. CIV. A. 09-1615, 2010 WL 2034550 (W.D. Pa. May 21, 2010) (same).

In the law of oil and gas leases, a lessee's promise to pay a landowner royalties that derive after production commences is, without more, insufficient consideration to support a lease. "A royalty is an agreed return paid for the oil, gas, and minerals, or either of them, reduced to possession and taken from the leased premises." *Robinson*, 125 W.Va. at 224, 24 S.E.2d at 240. Where a lease does not obligate the lessee to make any payments in lieu of production, and allows the lessee to indefinitely delay production under the promise of paying royalties if the lessee chooses to develop the property, courts will tend to invalidate the lease. Such a lease "would allow the lessee to do absolutely nothing with the lease[]" while the lessor remained bound by the lease. *ICG Natural Res., LLC v. BPI Energy, Inc*., 399 Ill. App. 3d 554, 558, 926 N.E.2d 446, 450 (2010). Such "royalty only" leases are "held unenforceable for lack of mutuality, based on the elementary principle of the law of contracts that if one party to a contract is under no obligation to perform at all, the contract is void." *Davis v. Nokomis Quarry, Inc*., 77 Ill. App. 3d 1011, 1013, 397 N.E.2d 216, 218 (1979) (quotation omitted). A landowner's interest in future royalties "is largely inconsequential in determining whether sufficient consideration supports a lease. This immateriality emanates from the fact that any royalty payment will come to fruition only where the lessee chooses to develop the property." Eiken, 89 N.D. L. Rev. at 690. "This Court has recognized the unfairness of allowing a lessee to effectively tie up land when others stood ready to develop the same." *St. Luke's United Methodist Church v. CNG Dev. Co*., 222 W.Va. 185, 191-92, 663 S.E.2d 639, 645-46 (2008).

41

The circuit court's order implicitly recognized that, because a promise to pay future royalties if production is commenced cannot independently constitute sufficient consideration, without Chesapeake's payment of the up-front bonus, no sufficient consideration supports the January 2011 paid-up lease. This Court has, for over a century, recognized that the payment of an up-front bonus is the consideration that will support an oil and gas lease when the lessee is not bound to drill or pay any other delay rentals. Syllabus Point 1, *Pyle v. Henderson*, 65 W.Va. 39, 63 S.E. 762 (1909) ("Though a lease for oil and gas, for a money bonus as consideration, does not bind the lessee to drill or pay money in lieu of doing so, but leaves it optional with him to do so or not, the lessor cannot annul or revoke it merely on the ground of want of mutuality of obligation.").

After consideration of the record, a careful reading of the January 2011 lease and the accompanying Order of Payment, we cannot say that the circuit court erred in ordering Chesapeake to immediately pay Mr. Hickman the $179,710 up-front bonus. Chesapeake insists that the January 2011 arbitration clause is binding and effective, but the circuit court correctly discerned it was only binding and effective *if* Chesapeake paid Mr. Hickman the up-front bonus due in exchange for Mr. Hickman's execution of the arbitration clause. Chesapeake cannot have its cake and eat it too; it cannot say there is a binding arbitration contract whilst simultaneously claiming its consideration for execution of the contract was illusory and non-existent. To the extent that the circuit court granted summary judgment to Mr. Hickman and ordered Chesapeake to pay Mr.

Hickman his up-front bonus (plus statutory, pre-judgment interest), we affirm the circuit court's order.

We part from the circuit court's order on another point: the question of royalties. The circuit court ordered Chesapeake to pay Mr. Hickman any royalties due under the 2011 lease. As we have just discussed, royalties are due *after* the execution of the lease, and *after* any minerals have been extracted from the leased tract. If Chesapeake has failed to pay any royalties, this presumes the existence of a lease, and then questions exist of whether Chesapeake has breached the lease. Such a question is plainly a claim that falls within the substantive scope of the January 2011 arbitration clause. Syllabus Point 2, *TD Ameritrade*, 225 W.Va. at 251, 692 S.E.2d at 294. Accordingly, we reverse the circuit court's order that required Chesapeake to pay Mr. Hickman past royalties, plus interest. On remand, the question of unpaid royalties must be resolved by arbitration.

C. *The July 2006 Lease*

The next lease we consider is the July 2006 lease, signed solely by Mr. Hickman. Mr. Hickman claims that he and his three siblings, through Mr. Capouillez, negotiated a lease with Range Resources that would (a) include all four siblings on the same lease, and (b) would include the same effective starting date. Mr. Hickman argues that he (and his siblings) had a "meeting of the minds" with Range Resources on these two points. As evidence, he points to the memorandum of lease filed with the Ohio County Clerk in June 2006 stating that the tract had been leased by all four siblings for a

43

five-year term starting December 21, 2005. A meeting of the minds is the essence of all contracts. Syllabus Point 1, *Martin*, 112 W.Va. at 332, 164 S.E. at 859.

The July 2006 lease appears to have failed to meet these two points. First, the lease had a signature line only for Mr. Hickman as the lessor, and made no mention of Mr. Hickman's siblings. Second, Mr. Hickman claims a representative for Range Resources modified the signed lease to read that it would take effect on July 19, 2006. On this evidence, the circuit court fairly concluded there had been no "meeting of the minds" in the formation of the July 2006 lease. The circuit court therefore voided the lease, and its included arbitration clause.

Chesapeake, Range Resources and Mr. Capouillez assert that the circuit court's voiding of the July 2006 lease violated the doctrine of severability. We agree.

First, we note that counsel for Range Resources and counsel for Mr. Capouillez made motions to enforce the arbitration clause within the July 2006 lease. We can find nothing in the record to suggest that counsel for Mr. Hickman responded, as required by the FAA, by severing and explicitly challenging the enforceability of the arbitration clause. Instead, Mr. Hickman's counsel bluntly challenged the enforceability of the July 2006 lease as a whole, in violation of the severability principles required by the FAA. *See* Syllabus Point 4, *Richmond American Homes*, 228 W.Va. at 129, 717 S.E.2d at 913.

Further, when a trial court is ruling upon a motion to compel arbitration pursuant to the FAA, "the authority of the trial court is limited to determining the threshold issues of (1) whether a valid arbitration agreement exists between the parties;

and (2) whether the claims averred by the plaintiff fall within the substantive scope of that arbitration agreement." Syllabus Point 2, *TD Ameritrade, Inc*., 225 W.Va. at 251, 692 S.E.2d at 294.

We do not find any error with the circuit court's substantive conclusion, which is amply supported by the record. The error is that, under the July 2006 lease, the parties (Mr. Hickman, Range Resources, and Mr. Capouillez and his company) agreed to refer "[a]ny controversy or claim arising out of or relating to this Lease" to arbitration. Chesapeake too is a beneficiary of this arbitration clause by virtue of the 2010 assignment of the lease by Range Resources.[23] Under the FAA, the circuit court was required to enforce the parties' arbitration agreement unless the record established the agreement was void under general principles of state contract law.

As the plaintiff, Mr. Hickman, has not challenged the validity or enforceability of the arbitration clause within the July 2006 lease, we must presume the arbitration clause is valid and enforceable. So long as a "party does not sever the arbitration clause from the rest of the contract and make a discrete challenge to the validity of the arbitration clause," only an arbitrator can weigh the interpretation of the overall contract. *Brown I*, 228 W.Va. at 765, 724 S.E.2d at 279. In the absence of any finding by the circuit court that the arbitration clause is unenforceable under general

---

[23] *See* Syllabus Point 2, *Cotiga Dev. Co. v. United Fuel Gas Co*., 147 W.Va. 484, 128 S.E.2d 626 (1962) ("An assignee of an oil and gas lease who has assumed the obligations of the lessee thereunder succeeds to only such rights as the lessee had against the lessor, and the covenants of the lease for the benefit of the lessor become binding upon the assignee in the same manner and degree as originally upon the lessee.").

45

principles of state contract law, any controversy or claim arising out of the July 2006 lease must be assessed pursuant to the lease's arbitration clause.

### D. *The December 2005 Lease*

Finally, we end with the first lease at issue, which was not signed by Mr. Hickman but was signed by his three siblings on December 21, 2005. Mr. Hickman asserts, and the circuit court agreed, that he intended to be bound on this lease under the same terms as his three siblings. The circuit court found that Mr. Hickman and Range Resources had reached a "meeting of the minds" that Mr. Hickman was to be a part of the five-year term beginning December 2005, and further found that the lease had expired on December 21, 2010.

Range Resources, Chesapeake, and Mr. Capouillez (and his company), contend the circuit court's substantive interpretation of the December 2005 lease violated the severability doctrine. As with the July 2006 lease, the defendants argue that the circuit court should have referred questions about the lease to arbitration. We agree.

The plaintiff in this case seeks to enforce the substantive terms of the December 2005 lease in his favor (while sidestepping the arbitration clause), even though he did not sign this lease. It was signed only by his three siblings, but we are not troubled by the lack of a signature by the plaintiff. It is accepted law that "a nonsignatory may be estopped from avoiding arbitration where [he] knowingly accepted the benefits of an agreement with an arbitration clause. . . . The benefits must be direct—that is to say, flowing directly from the agreement." *Life Technologies Corp. v. AB Sciex Pte. Ltd.*,

46

803 F.Supp.2d 270, 273-74 (S.D.N.Y. 2011) (citations omitted). In contrast, "the benefit derived from an agreement is indirect," and is therefore insufficient to support estoppel, "where the nonsignatory exploits the contractual relation of parties to an agreement, but does not exploit (and thereby assume) the agreement itself." *MAG Portfolio Consultant, GMBH v. Merlin Biomed Grp. LLC*, 268 F.3d 58, 61 (2d Cir. 2001).

When a party seeks to compel enforcement of an arbitration provision in a lease, the severability doctrine limits a trial court to examining the enforceability of the arbitration provision. Of course, using general principles of state contract law, the trial court may assess the arbitration provision in context, and consider other parts of the contract that relate to, support, or are otherwise intertwined with the operation of the challenged provision. In this case, the circuit court erred when it by-passed analysis of the arbitration provision and jumped straight to consideration of the merits of the December 2005 lease. This is prohibited by the FAA.

Accordingly, the circuit court's substantive rulings interpreting the December 2005 lease must be reversed. In the absence of any finding by the circuit court that the arbitration clause is unenforceable under general principles of state contract law, any controversy or claim arising out of the December 2005 lease must be assessed pursuant to the lease's arbitration clause.

## IV.
## CONCLUSION

The circuit court's August 7, 2014, summary judgment order is affirmed, in part, and reversed in part. We recognize that the parties may now face three separate,

47

expensive arbitration proceedings as opposed to the one contemplated by the circuit court. The FAA "permits courts to protect parties from grossly unfair, unconscionable bargains," not "stupid or inefficient bargains willingly and deliberately entered into" (particularly by commercial litigants). *State ex rel. Johnson Controls, Inc. v. Tucker*, 229 W.Va. 486, 497, 729 S.E.2d 808, 819 (2012). The case is remanded to the circuit court for further proceedings.

Affirmed, in part, Reversed, in part, and Remanded.